Phyllis Jean Pierce **WILSON** and William Edgar Wilson, III, Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 82–555–N.**

United States District Court,
M.D. Alabama, N.D.

June 20, 1984.

Ted Taylor, Prattville, Ala., for plaintiffs.

John C. Bell, U.S. Atty., Kenneth E. Vines, Asst. U.S. Atty., Montgomery, Ala., for defendant.

## MEMORANDUM OPINION

HOBBS, District Judge.

Plaintiffs Phyllis and William Wilson have commenced this action for damages under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 et seq., against the United States, alleging negligence on the part of doctors employed at the United States Regional Hospital at Maxwell Air Force Base, Alabama. Specifically, plaintiffs allege that defendant's employees were negligent in their care and treatment of Phyllis Wilson in October 1971 and that their negligence proximately caused Mrs. Wilson's sterility and resulting physical pain and mental anguish. Defendant denies that its employees were negligent and affirmatively alleges that plaintiffs' claims are barred by the applicable two-year statute of limitations. See 28 U.S.C. § 2401(b). On January 29, 1981, plaintiff Phyllis Wilson filed an administrative claim with the appropriate federal agency, and on March 6, 1981, plaintiff William Wilson filed a similar claim. Both claims were denied on April 23, 1982.

This Court has jurisdiction pursuant to 28 U.S.C. § 1346(b). This matter was tried before the Court on March 13, 1984. The Court, having considered the evidence presented at trial, and the arguments of the parties as reflected in their briefs, now enters this memorandum opinion pursuant to Rule 52 of the Federal Rules of Civil Procedure, incorporating its findings of fact and conclusions of law. For the reasons that follow below, the Court finds for the defendant.

## FACTS

The evidence in this case reveals the unfortunate story of a young girl rendered sterile from an abscess which formed in her abdomen secondary to a ruptured appendix. This case also highlights the extreme difficulties facing doctors in accurately diagnosing abdominal pathologies and deciding if and when surgery is necessary.

On Saturday morning, October 9, 1971, Phyllis Wilson (hereinafter referred to as plaintiff) awoke suffering from abdominal pains. She was nauseated and vomiting. Her condition did not improve during the day, and she was taken by her mother to the emergency room at the Maxwell Air Force Base Regional Hospital, where, after an hour's wait, she was seen by Dr. Richard Gregory. She told Dr. Gregory that she suffered from cramps, anorexia, nausea, and vomiting. Dr. Gregory manually examined her abdomen and determined that she had diffuse minimal tenderness but with no localization of pain. She also

had no fever or chills. Dr. Gregory diagnosed plaintiff's symptoms as viral gastroenteritis, and since most patients with similar symptoms improved within a short period of time, he told plaintiff to return to the general therapy clinic the following week if her condition did not improve. He prescribed no drugs or medicines and performed no rectal or pelvic examination, neither did he take her blood count.

Plaintiff's condition did not significantly improve over the weekend, and the records indicate that she visited the clinic on Thursday, October 14, 1971,[1] and was examined and treated by Dr. Thomas Roberts. She was still complaining of cramps, anorexia, and abdominal tenderness. Again, she had no fever or chills, but on this occasion she complained of constipation. Dr. Roberts reviewed her medical history and examined her abdomen. He found some tenderness but no organ enlargement. He also examined her stool to test for ovum parasites, but this test proved negative. Since the pain and tenderness still had not localized, and since plaintiff stated that she felt better, Dr. Roberts conducted no pelvic or rectal examination and did not obtain a blood count. He prescribed a soft diet and Maalox, and told plaintiff to return to the clinic on Monday, October 18, 1971, if her condition had not improved. His diagnosis was viral gastroenteritis status post. At the time Dr. Roberts did not feel that plaintiff had appendicitis since she had gone six days without fever, chills, or localization of the abdominal pain in the right lower quadrant.

On the following morning, October 15, 1971, plaintiff awoke "feeling like I had never been sick." Plaintiff's First Deposition, p. 25. She felt well enough to attend a homecoming parade at her high school. While she was watching the parade, however, she suddenly doubled over in pain and was rushed home.

Her condition did not improve over the weekend, and her medical records indicate that plaintiff next visited the clinic on Monday, October 18, 1971. Again, plaintiff complained of cramping, anorexia, constipation, and abdominal tenderness. At the insistence of plaintiff's mother, Dr. Roberts took a blood test; the results of this test indicated that plaintiff's white cell count was elevated from a normal level of 8,000–10,000 to 21,300. The elevated white cell count suggested the probability of inflammation and prompted Dr. Roberts to recommend that plaintiff be admitted to the hospital.

After entering the hospital around 5:00 p.m. on Monday, plaintiff was subjected to an extensive examination. Dr. Roberts first re-examined her medical history and noted that in February 1971 she had visited the clinic complaining of abdominal pain, nausea, and vomiting. She was diagnosed at that time as having viral gastroenteritis, and her condition improved on clear liquids and Phenegan. After reviewing her immediate medical history, Dr. Roberts examined her skin, head, eyes, ears, nose, throat, neck, and chest, all of which appeared normal. An abdominal examination revealed diffuse tenderness with no localized pain. She had one to two plus rebound, more marked in the lower quadrants. A pelvic examination revealed no masses or significant tenderness in the cervix. Based upon her medical history and his observations, Dr. Roberts felt that regional enteritis or inflammable bowel disease was the most likely diagnosis. Other possibilities included acute appendicitis, pyelonephritis, or a prolonged case of gastroenteritis.

On the following morning, October 19, 1971, plaintiff was examined by Dr. Larry Hollier. Dr. Hollier reviewed her medical

---

**1.** While plaintiff's medical records indicate that plaintiff made only three visits to the emergency room or the clinic before being admitted to the hospital, plaintiff vigorously claims she remembers making at least five visits. This claim of five visits is disputed by defendant. Dr. Gregory testified that it would be highly unlikely that plaintiff visited the emergency room or clinic without a notation of the visit. Gregory Deposition, p. 36. Defendant's position is also somewhat supported by plaintiff's complaint, wherein she alleged that she made three visits to the emergency room or clinic before being hospitalized.

history and then performed a complete examination, including both rectal and pelvic examinations. These examinations revealed a soft mass in the posterior cul-de-sac and a moderately tender anterior mass. Dr. Hollier believed that these findings pointed to a diagnosis of a pelvic abscess secondary to a ruptured appendix, but he also recognized that they could be consistent with other diagnoses such as tubal pregnancy or regional enteritis. He ordered a Gravindex test to check for tubal pregnancy but it proved negative. He took another complete blood count and found that plaintiff's white cell count had decreased to a more normal level of 15,000, down from 21,300 on Monday. He testified in his deposition that the marked reduction in the white cell count points up the diagnostic problems which confronted the doctors; at the same time the white cell count was decreasing, her infection was obviously worsening.

Dr. Cox, a gynecologist on staff at Maxwell, requested that x-rays be taken along with a barium enema. The barium enema revealed a spasm in the sigmoid colon and elevation of the bowels and colon out of the pelvis. A bowel series was taken that was somewhat suggestive of Crohn's disease, or regional enteritis. An intravenous pyelogram was conducted and showed a mild dilatation of the right ureter down to the pelvic inlet. These findings confirmed Dr. Hollier's early diagnosis of a pelvic abscess and indicated that the abscess was progressing in size and severity.

Plaintiff was again examined by Dr. Hollier on Wednesday, October 20, 1971. A temperature check revealed that plaintiff was afebrile. Dr. Hollier noted that the absence of a fever "certainly makes diagnosis of pelvic abscess less tenable and regional enteritis more likely." Hollier Deposition, pp. 37–38. Another temperature check on October 21, 1971, however, indicated that plaintiff had a low grade fever and that her white cell count was still elevated above normal. An upper GI and small bowel series were performed by Dr. Roberts. These tests revealed no abnormalities in the upper GI tract but a considerable mucosal edema in the region of the terminal ileum. The distal aspect of the ileum showed extensive pressure from an adjacent mass in the right upper portions of the pelvis and at the pelvic inlet. Although some of these findings were suggestive of Crohn's disease or a tubo-ovarian pathology, Dr. Hollier concluded that a pelvic abscess secondary to an appendiceal rupture was a more likely diagnosis.

On October 22, 1971, after reviewing plaintiff's barium enema and small bowel series results, and after discussing plaintiff's case with the radiologist and internist, Dr. Hollier concluded that an exploratory laparotomy was necessary. At the same time, however, the possibility that plaintiff had an ovarian cyst, tubo-ovarian abscess, or even ovarian malignancy was considered. These possibilities were discussed with plaintiff's mother, and she was informed that should an ovarian cyst or ovarian malignancy be discovered, a total hysterectomy to remove the fallopian tubes and ovaries might be necessary.

The following morning, October 23, 1971, an exploratory laparotomy was performed. A midline incision was made from the umbilicus to the pubis, and the abdomen was explored. While the upper abdomen appeared normal except for the presence of an enlarged spleen, the doctors found that plaintiff's appendix had indeed ruptured. The entire pelvic region was reddened and edematous with multiple adhesions in the area of the uterus. The ovaries could be palpated but could not be visualized because they were bound down in the abscess. The posterior aspect of the uterus was adherent to a large pelvic mass; upon separation of the mass from the uterus, a yellowish-green pus was discovered. After the remainder of the abdomen was isolated to prevent the spread of infection, the pus was aspirated, and the abscess was irrigated with large amounts of saline and antibiotics. A small tube was placed in this region so that after closure of the incision antibiotics could continue being placed into the abscess cavity.

During this operation, a surgical decision was made not to remove the ruptured appendix. The presence of wide-scale inflammation and the possibility of bowel damage which could have endangered plaintiff's life mandated this decision. None of the experts testified that this was an incorrect decision. Plaintiff and her mother were informed of this decision and the need for a subsequent operation to remove plaintiff's ruptured appendix.

After the laparotomy and drainage of the pelvic abscess, plaintiff's condition significantly improved. She ceased having abdominal pain and her appetite increased. She was released from the hospital on November 4, 1971.

By March 24, 1972, plaintiff's pelvic inflammation had disappeared, and Dr. Hollier performed a second operation to remove her appendix. During this second operation, Dr. Hollier observed multiple adhesions in the lower abdomen and pelvis. The fallopian tubes were markedly scarred and inflamed, and appeared to be occluded. The ovaries and uterus also appeared moderately scarred. Although Dr. Hollier testified in his deposition that he told Mrs. Pierce that the pelvic abscess had caused adhesions and scarring to plaintiff's fallopian tubes and that plaintiff might not be able to have children, both plaintiff and Mrs. Pierce emphatically denied this conversation occurred.

During the years immediately following these two operations, plaintiff apparently suffered no further serious complications. On a few occasions she did suffer unusually painful menstrual cramps, but there was no significant cause for alarm.

After graduating from high school in June 1973, plaintiff enrolled at the University of Alabama. Upon learning in one of her classes that women with abdominal surgery sometimes had difficulty bearing children, plaintiff visited Dr. Cox, who was then in private practice, in November 1974 and underwent an x-ray examination of her uterus and fallopian tubes. Dr. Cox reviewed the results of this examination and informed plaintiff that she had nothing to worry about, (Plaintiff's Deposition, p. 14), which plaintiff interpreted to mean that no abnormalities had been found.[2]

After her marriage on March 26, 1976, plaintiff experienced difficulty in getting pregnant. Finally, in 1979, plaintiff believed she had become pregnant. She visited Dr. Felix Tankersley, a gynecologist, to confirm her belief, but tests revealed otherwise. Dismayed at her inability to become pregnant, plaintiff next visited Dr. Stuart May, a Montgomery fertility specialist. After taking a series of tests, Dr. May conducted another x-ray of plaintiff's uterus and fallopian tubes. This x-ray indicated that plaintiff's fallopian tubes were occluded.

At the request of Dr. May, plaintiff travelled to Birmingham in October 1980 for an examination by Dr. Benjamin Younger, a renowned fertility expert and professor of medicine at the University of Alabama at Birmingham. On October 10, 1980, Dr. Younger performed a laparoscopy, a minor surgical technique where the doctor, using instruments, examines the uterus and fallopian tubes. He found extensive adhesions and scarring in the pelvis involving both fallopian tubes and ovaries. The extensive nature of the scarring led Dr. Younger to conclude that plaintiff was a poor candidate for reconstructive surgery, and he so informed plaintiff and her mother. He also informed plaintiff that the adhesions and scarring probably resulted from the pelvic abscess which formed secondary to her ruptured appendix. Plaintiff claims that this occasion represented her first knowledge that the incidents in October 1971 caused her sterility.

## STATUTE OF LIMITATIONS

■ The FTCA bars tort claims against the Government unless the claim is

---

**2.** Dr. Younger testified that the x-rays taken by Dr. Cox actually show occlusions and that Dr. Cox either misread these x-rays or failed truthfully to inform plaintiff that her fallopian tubes were occluded.

presented in writing to the appropriate agency within two years after the claim accrues. 28 U.S.C. § 2401(b). In medical malpractice cases, the Supreme Court has determined that a cause of action accrues within the meaning of Section 2401(b) when a plaintiff learns, or in the exercise of reasonable diligence should have learned, of both the existence of her injury and its cause. *Kubrick v. United States*, 444 U.S. 111, 124–125, 100 S.Ct. 352, 360–361, 62 L.Ed.2d 259 (1979). In other words, the statute is triggered when the plaintiff possesses the critical facts that she has been injured and who inflicted the injury, not when she learns that her injury was negligently inflicted. *Id.* at 122–23, 100 S.Ct. at 359–60.

Defendant maintains that Dr. Hollier informed plaintiff and her mother about the scarred condition of plaintiff's fallopian tubes, and it offers the deposition testimony of Dr. Hollier as proof thereof. When asked whether he informed plaintiff's mother about the condition of plaintiff's fallopian tubes, Dr. Hollier replied:

> I know that I discussed with the mother, at least the condition of her abdomen and that everything was bound down in scar tissue. I believe that after the original operation when I told her mother that we did not have to take out the tubes and ovaries, I believe I told her at that time that there was a great deal of inflammation and scar tissue. We did not have to take out the womb or ovaries but she did have a lot of scar tissue.
>
> I don't honestly recall specifically if I used the words that she could not get pregnant. I know I did not tell her definitely, this child will never have children ... I do know that I specifically discussed with them the bad state of her pelvis at the time of her first laparotomy and the extent of the inflammation that went on. Just as I noted that in my operative report.

Hollier Deposition, p. 70–71.

Both plaintiff and Mrs. Pierce emphatically denied that Dr. Hollier ever informed them about the scarring of plaintiff's fallopian tubes. Mrs. Pierce does remember some mention of scarring, but she interpreted this information to mean external scarring that naturally occurs whenever a surgical incision is made. After considering the evidence introduced at trial, the Court concludes that no one, including Dr. Hollier, informed plaintiff or Mrs. Pierce of the injuries to her fallopian tubes in a way that was meaningful to either of them. The Court does not attach any blame to the doctors for failing to tell a young girl of the possibility that she would not be able to have children. The issue is not whether the doctors were culpable in this regard, but whether plaintiff or her mother was sufficiently informed to bar a later claim for this condition which materialized. The Court also attaches no significance to the fact that plaintiff's medical records revealed that her fallopian tubes were severely scarred by the inflammation that occurred subsequent to the ruptured appendix. Neither plaintiff nor Mrs. Pierce possessed any medical knowledge that would enable them to attribute any significance to these records. It may also be significant on whether plaintiff's treating doctors advised plaintiff in a meaningful way as to the danger that she could not have children that when plaintiff visited Dr. Cox, one of those treating doctors, several years after the surgery, he advised plaintiff that she had no problem, reassuring her with respect to her concern about future childbearing.

Defendant next contends that even if plaintiff did not discover the injury for which she now sues—scarred fallopian tubes causing sterility—until 1980 when Dr. Younger performed the laparoscopy, she certainly discovered by March 1972, when the second operation was performed, that she had suffered an injury—a pelvic abscess which formed secondary to a ruptured appendix—and that this injury was in part caused by her doctor's failure to diagnose her symptoms as acute appendicitis and perform an earlier operation. Consequently, defendant relies on the well-established principle of tort law that lack of

knowledge of the injury's permanence, extent, or ramifications does not toll the statute where the plaintiff in fact knows she has suffered an injury and who caused the injury. *See Gustavson v. United States,* 655 F.2d 1034 (10th Cir.1981); *Robbins v. United States,* 624 F.2d 971 (10th Cir.1980).

Neither *Gustavson* nor *Robbins* is factually similar to the present case. In *Gustavson,* the alleged negligence by the doctors was their failure properly to diagnose plaintiff's bedwetting problems as vesicoureteral reflux, a condition easily rectified by surgery. Plaintiff in *Gustavson* was aware of this misdiagnosis in 1973, yet he failed to bring his lawsuit until 1977. In an effort to avoid application of section 2401(b), plaintiff argued that the statute should not have commenced running until he realized his condition was irreversible. The courts rejected this argument, holding that the statute began to run once plaintiff learned of his injury and its cause and that his ignorance of the injury's permanence, extent or ramifications did not toll the statute. *Gustavson v. United States,* 655 F.2d at 1036.

In *Robbins,* the alleged negligence by the doctor was in prescribing a certain drug to combat a skin disorder developed by plaintiff. The evidence disclosed that plaintiff was too young to use the drug, and, consequently, he developed stria, or marks on the skin. Another doctor informed plaintiff that the marks might or might not go away as he grew older. Four years later, plaintiff learned from another doctor that the marks probably were permanent. When the Government moved for summary judgment on the ground that the action was not timely filed, plaintiff claimed his ignorance of the extent and permanence of his injury should toll the statute. The court disagreed and ruled that such excuses were legally insufficient to toll the statute.

Unquestionably, the plaintiffs in both *Gustavson* and *Robbins* learned of the particular injury (and its cause) for which they sued more than two years before actually commencing suit. Each plaintiff was igno-

rant of the injury's permanency or ramifications, yet the courts in each case correctly viewed such ignorance as irrelevant. In the instant case, the Government argues that since plaintiff knew that she had suffered the injury of a ruptured appendix, severe infection, two hospitalizations and two surgeries because of the failure to diagnose earlier plaintiff's problem as appendicitis that she is barred from making a claim for the late diagnosis which allegedly caused sterility.

In ordinary personal injury cases, plaintiffs are generally aware of the extent, permanence, and ramifications of their injuries. In medical malpractice actions, however, the patient may not even know that she has been injured, or even if she does, she may not know that her doctor's negligence contributed to the injury. Moreover, her doctor might hesitate to supply the necessary information, knowing full well that such information may form the basis for a lawsuit against him. Thus, the patient may not learn the critical facts until the allowable time has passed.

Since the extent of plaintiff's knowledge of her injury and its cause is crucial in determining whether she had a fair opportunity to assert her claim, some courts have imposed a duty upon the doctor fully to disclose to plaintiff the nature of her injuries. *See, e.g., Almengor v. Dade County,* 359 So.2d 892 (Fla. 3rd D.C.A. 1978). *Accord, Pollard v. United States,* 384 F.Supp. 304, 309–10 (M.D.Ala.1974). Where the doctor fails faithfully to discharge this obligation, courts have analogized this failure to fraudulent concealment and have accordingly tolled the statute of limitations until plaintiff actually learns of her injuries. The Court is persuaded by the wisdom of such a rule and determines that application of that rule to the present case would be appropriate. The Court therefore concludes that the failure of the doctors fully to disclose to plaintiff or her mother that the scarring to plaintiff's fallopian tubes created a probability of sterility tolled the statute until plaintiff actually learned in 1980 of this

injury and its cause. Having so concluded, the Court holds that plaintiff's claim was timely filed.

### MERITS

■■ The Federal Tort Claims Act (FTCA) operates as a waiver of the Government's sovereign immunity in cases where federal employees have negligently caused personal injuries. *Riddlesperger v. United States,* 406 F.Supp. 617, 619 (N.D.Ala. 1976). Section 2674 provides that the Government "shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...." In determining the Government's liability, the FTCA directs federal courts to examine the law of the state in which the alleged negligence occurred. 28 U.S.C. § 1346(b); *Edwards v. United States,* 497 F.Supp. 379, 381 (M.D.Ala.1980). Under Alabama law, a physician is required "to exercise such reasonable care, diligence, and skill as physicians ... in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case." *Ala.Code* § 6–5–484(a) (1975); *Overstreet v. United States,* 528 F.Supp. 838, 839, 844 (M.D.Ala.1981). Furthermore, the applicable standards of care and the existence *vel non* of a breach of those standards must be established by expert medical testimony. *Gilbert v. Campbell,* 440 So.2d 1048, 1049 (Ala.1983).

Plaintiff's theory of negligence is premised on the fact that Drs. Gregory and Roberts failed to perform a pelvic or rectal examination or take a complete blood count on either of plaintiff's two recorded visits and that had they performed these examinations, appendicitis would have been diagnosed and an appendectomy could have been performed before the appendix ruptured and the pelvic abscess formed. She has introduced strong, persuasive evidence that the failure to perform these examinations constituted a deviation from the acceptable, medical standards which prevailed in October 1971.

Plaintiff has submitted as evidence in this case the deposition of Dr. Neil Farber, an Assistant Professor of Medicine at Hahnemann University in Philadelphia, Pennsylvania. Dr. Farber testified that acceptable medical standards would have required Dr. Gregory and Dr. Roberts to perform at least a rectal examination and to obtain plaintiff's blood count, if not also a pelvic examination based on her complaints. Farber Deposition, pp. 8–9. He further stated that these tests could have increased the likelihood that appendicitis would have been diagnosed, which would have mandated that plaintiff be hospitalized and an immediate laparotomy performed. Finally, Dr. Farber testified to the obvious fact that since appendicitis was not timely diagnosed, plaintiff's appendix ruptured and the consequent spread of infection caused the pelvic abscess to form, which in turn caused the adhesions and scarring to plaintiff's fallopian tubes and ovaries.

Plaintiff also relies on the deposition testimony of Dr. Earl Greenwald, a specialist in gynecologic pathology. After testifying that he had knowledge of the prevailing standard of care in October 1971, Dr. Greenwald opined that Drs. Gregory and Roberts deviated below that standard of care by failing to give at least a rectal examination and failing to obtain a blood count on plaintiff's first two recorded visits. Greenwald Deposition, p. 9. Consistent with Dr. Farber's testimony, Dr. Greenwald stated that had appendicitis been timely diagnosed and an appendectomy been performed prior to the rupture, the pelvic abscess would not have formed and the scarring of plaintiff's fallopian tubes and resulting sterility would not have occurred.

Finally, Dr. Benjamin Younger testified that a patient who complains of periumbilical cramping and anorexia, two classic signs of appendicitis, should have a blood count and be given at least a rectal examination. Furthermore, Dr. Younger characterized as reliable and authoritative an excerpt from *Harrison's Principles of Internal Medicine,* Chapter 12, page 66, which reads: "[A] careful pelvic and rectal examination are mandatory in every patient with

abdominal pain." *See* Plaintiff's Exhibit No. 7.[3]

■ While plaintiff has persuaded this Court that the prevailing standards of care mandated that a rectal examination or blood count should have been performed on at least one of plaintiff's recorded visits, the Court is not persuaded by the evidence that even had these examinations been performed, the doctors would have diagnosed acute appendicitis with sufficient certainty to make necessary an immediate laparotomy. The gaps in plaintiff's proof are twofold. First, she has failed to persuade the Court that these examinations and tests would have revealed the presence of appendicitis to the reasonable exclusion of other abdominal pathologies or disease processes. Second, she has failed to persuade the Court that the doctors negligently delayed the operation and removal of her appendix before it ruptured and formed the pelvic abscess.[4]

Unquestionably, plaintiff's appendicitis was extremely difficult to diagnose. While she certainly had some of the classic symptoms of appendicitis (periumbilical cramping, anorexia, nausea, and vomiting), Dr. Roberts testified that these symptoms are also consistent with irritable bowel syndrome and a multitude of other gastrointestinal problems. Robert's Deposition, p. 31. Moreover, Drs. Shadburn, Hollier, Younger, and Gregory each testified that two other red flags of appendicitis (low-grade fever and localization of the tenderness and pain in the lower right quadrant, which localization normally occurs within twelve to forty-eight hours after the onset of the symptoms) were conspicuously absent in plaintiff's case. Furthermore, even after plaintiff's appendix had undoubtedly ruptured and the pelvic abscess had formed, her treating doctors were still in legitimate disagreement over the proper diagnosis. Dr. Roberts felt that plaintiff's long history of intermittent abdominal cramping, when coupled with the diffuse nature of her abdominal tenderness, suggested the probability that plaintiff was suffering from regional enteritis, a condition far more common than acute appendicitis. Dr. Cox noted that the presence of a pelvic mass suggested the possibility of an early pregnancy. An ovarian malignancy, a twisted ovarian cyst, or a prolonged case of gastroenteritis, were also distinct possibilities.

Furthermore, plaintiff's own expert witness concluded that given plaintiff's symptoms, a rectal examination would probably have yielded only a slight diagnostic benefit. When questioned on cross-examination about what a rectal examination would have revealed to Dr. Gregory had he performed one on October 9, Dr. Greenwald conceded that no abnormalities or indication of appendicitis would probably have been discovered. Greenwald Deposition, pp. 39, 50. He likewise testified that had a rectal examination been given to plaintiff on October 14, some tenderness would have been revealed, but this tenderness would have been consistent with a number of disease processes. Greenwald Deposition, p. 41. While stating that the presence of tenderness would have increased the index of suspicion for appendicitis, Dr. Greenwald stopped noticeably short of concluding that a rectal examination on October 14 would have revealed to Dr. Roberts that an immediate laparotomy was needed. Furthermore, more than one doctor commented on the limited diagnostic benefit of a blood count, since appendicitis may or may not be accompanied by an elevated white cell count and since other abdominal diseases or pathologies can also cause an increase in the white cell count. Moreover, the white cell count had dropped significantly from

---

3. Although *Harrison's Principles* states that pelvic examinations are mandatory, nearly all of the doctors agreed that they would hesitate performing a pelvic examination on a fifteen-year old virgin. *See, e.g.,* Greenwald Deposition, p. 13; Younger Deposition, p. 24.

4. Although no one could pinpoint the exact time that plaintiff's appendix ruptured, most of the doctors agreed that it probably ruptured on Friday, October 15, 1971, when plaintiff doubled over in pain while attending the homecoming parade at her high school.

Monday, the eighteenth, to Tuesday, the nineteenth.

Finally, plaintiff has not persuaded the Court that the doctors negligently delayed the operation to remove plaintiff's appendix. Plaintiff's proof that they did negligently delay the appendectomy presumably rests on an assumption that a pelvic or rectal examination, or blood count, would have clearly revealed to the doctors that plaintiff was suffering from acute appendicitis and that an immediate laparotomy was needed. But as noted earlier, even had the doctors performed a pelvic and rectal examination or obtained a blood count, they probably would not have diagnosed appendicitis with such a degree of probability that they would have determined the need for an appendectomy. *See* Hollier Deposition, p. 34. It is highly significant on the issue of whether the doctors' failure to perform the indicated tests was a proximate cause of the delay in performing the surgery that even after plaintiff was hospitalized and a battery of doctors had performed rectal and pelvic examinations, had obtained plaintiff's blood count, and done numerous other tests, they were still undecided as to the wisdom of operating. If plaintiff's problems were caused by enteritis, surgery was contraindicated. Furthermore, as stated by Drs. Gregory and Hollier, most surgeons would delay an appendectomy, or even exploratory surgery, until the abdominal pain had become more localized. *See* Gregory Deposition, p. 35–36; Hollier Deposition, p. 17. Since plaintiff's abdominal pain apparently never localized in the right lower quadrant and since plaintiff apparently suffered no fever until October 21, 1971, the Court finds the doctor's decision not to operate on or before Friday when the appendix probably ruptured did not deviate below acceptable, medical standards.

Plaintiff also offered evidence that the doctors were negligent in delaying the laparotomy from October 18, when plaintiff was admitted into the hospital, until October 23. Dr. Greenwald testified that the x-rays and various tests performed subsequent to plaintiff's admission to the hospital were unnecessary and only served to delay the exploration and drainage of the pelvic abscess. He further opined that a laparotomy should have been immediately performed, and the delay of surgery until October 23, 1971, deviated from acceptable, medical standards of care. Greenwald Deposition, p. 17.

This testimony from Dr. Greenwald represents the only concrete evidence offered by plaintiff on the issue whether the doctors were negligent in delaying the surgery until October 23. There was no other significant testimony from any of the doctors that had they been treating plaintiff, they would have operated either before the appendix ruptured or even before October 23, when the laparotomy was performed. However, as the following colloquy indicates, even Dr. Greenwald conceded that an operation on October 18 would probably not have prevented the injuries to plaintiff's fallopian tubes:

(Q). Do you have an opinion as to whether or not, assuming she had been operated on October 18, when she was admitted, would that have made any difference in her condition as far as her sterility is concerned?

. . . . .

(A). I think that it's most likely that she had a pelvic abscess when she was admitted on the 18th. She had ruptured several days before, in my opinion, and I think if you're looking at the sterility issue primarily, that it's likely that she had sufficient injury to the tubes to cause sterility at the time of admission.

Greenwald Deposition, p. 60. Given this concession by plaintiff's own expert, the Court must conclude that this delay, even if negligent, did not cause plaintiff's injuries.

Furthermore, Drs. Roberts and Hollier offered persuasive testimony that there was no negligence in delaying the surgery from October 18 until October 23. Dr. Roberts testified that surgery was delayed until October 23 because the doctors had

yet to reach a firm diagnosis. The possibility that plaintiff was suffering from regional enteritis, an inflammatory condition which could be exacerbated by surgery, was real. Roberts Deposition, p. 26–27; Hollier Deposition, p. 19. Furthermore, and most importantly, Dr. Hollier testified that the delay in the exploratory surgery was necessary to allow the inflammation in plaintiff's bowel to subside. Surgery before the bowel inflammation had subsided could have endangered plaintiff's life. Hollier Deposition, p. 58. Accordingly, the Court is unwilling to substitute its judgment for the judgment of the team of doctors who unanimously were of the opinion that delay at that time was required for the safety of the patient.

From hindsight, surgery should have gone forward on or about October 9 when plaintiff first appeared, but no doctor was of the opinion that surgery would have been proper on the basis of information obtainable at that time. The Court is aware of the criticism of doctors that in some cases they are too quick to use the knife. In this case, they are charged with being too slow. Liability should not follow from a reasonable judgment call, even if the judgment proves wrong. This is not a case where a doctor negligently fails to consider appendicitis as a possible diagnosis. This is a case where the diagnosis was considered but in exercising the best judgment of which the treating physicians were capable, surgery was delayed.

Finally, the Court concludes that the husband's claim for damages for loss of consortium and services should also fail. Aside from the fact that these claims are derivative to his wife's claims and, therefore, the determination that his wife cannot recover precludes his recovery, the Court has extreme doubt as to whether a husband may recover damages for his losses that result from injuries suffered by his wife many years prior to their marriage.

A separate judgment will be entered in accordance with this memorandum opinion.

JUDGMENT

In accordance with the attached memorandum opinion, it is

ORDERED, ADJUDGED and DECREED that plaintiffs have and recover nothing from defendant.

It is further ORDERED that court costs incurred in this proceeding be and they are hereby taxed against plaintiffs, for which execution may issue.