Luis A. MENDEZ, an infant, By his
guardian, Teresa MARTINEZ,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 84 Civ. 6941.

United States District Court,
S.D. New York.

Jan. 30, 1987.

Speiser & Krause, P.C., New York City, for plaintiff; Kenneth P. Nolan, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendant; Stephen Dvorkin, Noel Ferris, Asst. U.S. Attys., of counsel.

## INTRODUCTION

IRVING BEN COOPER, District Judge.

Plaintiff, guardian of minor Luis Anthony Mendez, brings this action on behalf of her grandson under the Federal Tort Claims Act (hereinafter "F.T.C.A."), 28 U.S.C. §§ 1346(b), 2671 *et seq.* (1982), alleging personal injury as a result of malpractice by government doctors. The government asserts that the action is time barred under 28 U.S.C. § 2401(b) (1982) since plaintiff did not present the claim to the appropriate agency within two years from its accrual. A bifurcated non-jury trial was held before us on February 6, 1986 solely to determine the issue whether the claim is barred by the statute of limitations, the

issues of liability and damages to be reserved for the outcome of this decision.

## FACTS

Luiz Mendez and his wife Kyong Ok Ku Mendez were stationed at Fort Lewis in Tacoma, Washington. On December 10, 1977, at the Madigan Army Medical Center there, Mrs. Mendez gave birth to their son, Luiz Anthony Mendez (hereinafter "Tony"), the subject of this action. Ex. E [1]

Mr. and Mrs. Mendez were 19 years of age at the time. Mr. Mendez had a ninth grade education; his wife spoke only Korean. Ex. E.

Mrs. Mendez visited the Fort Lewis clinic several times prior to the birth of her son complaining of lower abdominal pains. Ex. A. at 3. During these visits Mrs. Mendez was worked "up for question of abruption versus hydraamnios." *Id.* On December 9, 1977, Mrs. Mendez was admitted to the Madigan Army Medical Center with premature rupture of the membranes; on December 10, she gave birth. Plaintiff's Post-Trial Brief Ex. 4.

Initially the obstetric staff believed that a vaginal birth would be possible. The baby's position was in transverse lie. Forceps, as well as a vacuum extractor, were used in an attempt to rotate the baby's position to facilitate birth, but ultimately these efforts failed. The vacuum extractor allegedly failed because the gasket, which should seal against the baby's head, was worn and so prevented an adequate seal. Ex. A at 3.

The doctors diagnosed cephalopelvic disproportion—that is, the baby was too large to deliver through the pelvis. Plaintiff's Post-Trial Brief, Ex. 4. Hence, after five (5) hours of second stage labor, a cesarian section was performed by Major David John Magelssen, M.D. Ex. A at 27. Upon birth, the baby did not breathe and had no discernable heartbeat for seven minutes. Government Motion for Summary Judgment (hereinafter "Motion") Ex. A. The baby also had an accumulation of fluids in his lungs which required extraction by needle, and he suffered from electrolyte imbalance (no further explanation given) and acidosis (a decrease of alkali in body fluids in proportion to the acid content; Stedman's Medical Dictionary 14 (5th ed. 1982)). Motion, Ex. A.

While Mrs. Mendez was in the recovery room, Dr. Magelssen spoke with Luiz Mendez: "[You] had a boy ... [b]ut he was born with complications.... He wasn't breathing but we revived him." Tr. 67. Mr. Mendez asked why the baby was born that way and Dr. Magelssen replied, "[t]hat's the way some children are born." *Id.* Dr. Magelssen testified that he neither gave Mr. Mendez an explanation for Tony's difficulties nor told him of the failed vacuum extraction. Tr. 110.

Tony was placed on a respirator from birth until January 4, 1978 (a period of 25 days). Motion, Ex. A. Tony experienced seizures on the day following birth; they did not recur during this hospital stay. *Id.* On December 18, 1977 an operation (pericardial drainage and xiphoidectomy) was performed without complication. *Id.* On February 14, 1978 after a hospital stay which commenced December 10, 1977 Tony was discharged. *Id.*

Kyong Mendez separated from her husband in October, 1980 and returned to Korea; her whereabouts are presently unknown. Ex. E. Teresa Martinez, the child's paternal grandmother, has been appointed legal guardian of Tony. Plaintiff's Post-Trial Brief, Ex. 3.

In May, 1978 Tony was moved to the Bronx, New York to live with Teresa Martinez while Luiz Mendez returned to his Army duties. During that time Teresa Martinez periodically took Tony to the Mutual Health Station in the Bronx for vaccinations and treatment for colds. Tr. 25, 27.

On December 5, 1978 Mrs. Martinez took Tony to the Lincoln Medical and Mental Health Center because he had symptoms of vomiting and diarrhea. He was admitted for eight (8) days. At this time Mrs. Martinez obtained Tony's Madigan Medical

---

**1.** Throughout this opinion, the letters "Ex." or "Tr." followed by a number or letter indicate

respectively a particular trial exhibit or page in the trial transcript.

Center records (pursuant to a request by the doctors at Lincoln Medical Center). Tr. 29. Tony was discharged with a final diagnosis of "Rt. Otitis Media" (inflamation of the middle ear; Stedman's Medical Dictionary 1006 (5th ed. 1982)), acute gastroenteritis and functional heart murmer. Ex. C at 45.

In February, 1979 Tony's grandmother brought him to the Mount Sinai Hospital (where he stayed eight (8) days) to be treated for convulsions. Tony was diagnosed as having epilepsy, Tr. 31, and febrile seizures (seizures accompanied by fever; Stedman's Medical Dictionary 517 (5th ed. 1982)). Ex. D at 119. Mrs. Martinez asked what caused Tony's epilepsy; the doctor replied "a lot of people have that." Tr. 31.

Tony continued to have problems as he grew: he could not turn over by himself; he was slow to walk, talk, and toilet train; his hands bent in awkward directions and he walked with a limp; he had difficulty performing normal tasks. Ex. F at 28–29; Tr. 36.

When Tony was three years old, upon recommendation of the Kennedy Center, an agency that aids handicapped children, he was enrolled at the Chama Early Intervention Center. Ex. G at 7. He attended for two years; they taught him, *inter alia,* to walk and helped in toilet training. Tr. 34–35.

At five years old, Tony was enrolled at the Lincoln Dynamic Unit—Community of the Handicapped District 7, in the Bronx. Ex. C at 8. There he received occupational, physical, and speech therapy three times per week for two years. Plaintiff's Post-Trial Brief, Ex. 3.

\* \* \* \* \* \*

On October 20, 1982 Mrs. Martinez read a newspaper article in the New York Post of that date which presented a circumstance very similar to that of her grandson. Tr. 72; Ex. 1. The article involved a five year old brain damaged girl (Argenida Gomez) who received a 4.6 million dollar settlement award from the hospital in which she was born.

As described physically, Argenida appears to have experienced difficulties not generally unlike Tony's: " '[s]he is moderately retarded. She can walk, but it took two years and four months to do that. She speaks on the level of a two-year old.' " Further, " 'when her mother was in labor [the child] suffered a lack of oxygen which resulted in brain damage and mental retardation.' " Ex. 1. That exhibit in full follows:

### Girl, 5, wins $4.6M settlement
#### By Kieran Crowley and Sam Rosensohn

[Photograph]

Argenida Gomez
Mildly Retarded

A brain-damaged 5-year old girl will have a $3000-a-month income for life as the result of a $4.6 million settlement reached yesterday with Brookdale Hospital Medical Center.

Brooklyn Supreme Court Justice Frank Composto approved the out-of-court deal that will give Argenida Gomez the tax-free income for the rest of her life.

Kenneth Nolan, attorney for the bright-eyed girl, said that "when her mother was in labor she suffered a lack of oxygen which resulted in brain damage and mental retardation.

"She is moderately retarded. She can walk, but it took two years and four months to do that.

"She speaks on the level of a two-year old," Nolan told The Post.

Nolan said he originally filed suit for $20 million two years ago and agreed to settle out of court when Brookdale Hospital "suggested that we open settlement negotiations."

Besides receiving $3000 a month, the Queens girl will be paid lump sums of $100,000 in 1992 and in 1997, with successive lump-sum payments of $150,000 and $200,000.

"I'm very happy for my clients," said Nolan, who works for Speiser and Krause of 200 Park Av.

If Argenida dies before turning 20, her mother, Sonia, 39 will receive $3000 a month until 1997.

NEW YORK POST OCT. 20, 1982

Ex. 1.

Mr. Mendez and Mrs. Martinez contacted the attorney named in the article; he informed them of the possibility of a causal relationship between the acts of the Madigan doctors during Tony's birth and his physical condition then present. Tr. 72–74.

\* \* \* \* \* \*

On November 25 and December 6, 1982 administrative claims were filed with the Department of the Army on behalf of Tony alleging that he suffered and will continue to suffer mental and physical damage as a consequence of medical negligence engaged in while attending his mother's labor and his delivery by Madigan's medical staff. Ex. 6.

The claims were denied by the Army on May 14, 1984 on the ground that they were untimely filed. The Army also concluded that the baby's condition was due to cardiac failure caused by the intra-uterine viral infection the mother experienced three weeks before delivery. The complaint was filed in this Court on September 26, 1984.

### LAW

Statutes of limitations "conventionally require the assertion of claims within a specified period of time after notice of the invasion of legal rights." *Quinton v.*

*United States,* 304 F.2d 234, 241 (5th Cir. 1962); *Urie v. Thompson,* 337 U.S. 163, 170, 69 S.Ct. 1018, 1024, 93 L.Ed. 1282 (1949). Such statutes exist primarily to promote fairness: to insure that a defendant will not have to resist a claim that accrued so long ago that an adequate defense is impracticable, and to provide a plaintiff a reasonable time within which to present a claim. *Lee v. United States,* 485 F.Supp. 883, 885 (E.D.N.Y.1980).

Recognizing this policy, Congress provided in the Federal Tort Claims Act:

a tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b) (1982).

It is well settled under the F.T.C.A. that plaintiff's minority will not toll the running of the statute of limitations. *Leonhard v. United States,* 633 F.2d 599, 624 (1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); *Camire v. United States,* 489 F.Supp. 998 (N.D.N.Y.1980). Hence we must determine when a claim "accrues" within the meaning of the F.T. C.A.

Plaintiff asserts the claim accrued in October, 1982 when she read the newspaper article. Defendant contends that the statute began to run no later than 1979 when Tony was taken to the Mount Sinai Hospital.

The statute and its legislative history are silent on the subject of accrual. *United States v. Kubrick,* 444 U.S. 111, 119 n. 6, 100 S.Ct. 352, 358 n. 6, 62 L.Ed.2d 259 (1979). There the Court examined the issue of when an F.T.C.A. claim accrues. The Court went beyond the traditional notion that a claim accrues when one is injured and adopted the discovery rule. This rule delays the accrual of a claim until a plaintiff discovers, or reasonably should have discovered, certain facts regarding the injury.

The Court drew a line at the point where a plaintiff has discovered enough information to know that his harm may be attributable to another. At this point, he can seek medical or legal advice as to whether his rights were violated. *Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359.

The precise moment of accrual under the F.T.C.A. occurs when "the plaintiff has or with reasonable diligence should have discovered the critical facts of both [1] his injury and [2] its cause." *Barrett v. United States,* 689 F.2d 324 (2d Cir.1982) (construing *Kubrick*). At this point, "[t]here are others who can tell [the plaintiff] if he has been wronged, and he need only ask." *Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359.

Bearing in mind these principles, we inquire whether plaintiff has timely presented the claim—specifically, whether plaintiff filed the cause of action within two years from the time she knew or reasonably should have known of Tony's injury and its cause.

### A. Knowledge of Injury

██ To be aware of an injury, plaintiff "need not know the full extent of his or her injury." *Allen v. United States,* 527 F.Supp. 476, 491 (D.Utah C.D.1981). The statute will run "even though the ultimate damage is unknown or unpredictable." *Robbins v. United States,* 624 F.2d 971, 973 (10th Cir.1980); *cf. Jastremski v. United States,* 737 F.2d 666, 670 (7th Cir.1984). The reason for this is clear. *Kubrick* requires knowledge of injury and causation because at this point a plaintiff can inquire of those with greater knowledge as to whether legal rights were violated. Logically, to stimulate such inquiry, plaintiff need not know the full extent of the damage, but just that some serious harm has occurred.

██ We find that plaintiff was sufficiently aware of Tony's injuries to satisfy this first prong of the *Kubrick* test. Tony's extensive hospitalization when born, his prolonged use of a respirator after birth, his need for an operation during that stay, his symptoms of convulsions, his later

diagnosis of epilepsy, his delay in rolling over alone, walking and talking, his inability to perform tasks normally, his malformed hands and leg—all clearly indicate severe injury.

Plaintiff contends that she did not know of Tony's mental retardation until late 1981 when Tony's teachers at the Chama School so informed her. Tr. 34–35; Plaintiff's Post-Trial Brief at 18. A Mount Sinai Hospital chart entry in February, 1979, however, reveals that Mrs. Martinez may then have been aware of Tony's possible brain damage: "[g]randmother states patient had difficult birth, possible brain damage from not enough oxygen." Ex. D at 24. This may prove significant bearing in mind that the full extent of the injury need not be known to satisfy *Kubrick.*

### B. Knowledge of Causation

■ The second prong of *Kubrick* requires that plaintiff have knowledge of the cause of the injury; this refers to "the act of the defendant which gave rise to the injury," not simply to the medical cause. *Lee,* 485 F.Supp. at 887. As Judge Richard Posner has stated:

> When there are two causes of an injury, and only one is the government, the knowledge that is required to set the statute of limitations running is knowledge of the government cause, not just of the other cause.

*Drazan v. United States,* 762 F.2d 56, 59 (7th Cir.1985); *see also Arvayo v. United States,* 766 F.2d 1416, 1420 (10th Cir.1985). Additionally, the Supreme Court specifically requires that for a claim to accrue, the plaintiff must be "in possession of the critical facts that he has been hurt and *who* has inflicted the injury." *Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359 (emphasis added).

Plaintiff was aware that the medical cause of Tony's injury was possibly lack of oxygen to the brain. *See* Ex. D. at 24. For our purposes, however, knowledge of the medical cause is not determinative. What we must examine is the government's position: that plaintiff was or should have been aware that the actions of the Madigan Army Medical Center doctors may have caused Tony's injury.

### 1. Subjective Analysis

Upon Tony's birth, his father asked Dr. Magelssen why Tony was born with such complications. Dr. Magelssen stated: "I didn't give [Luis Mendez] any reason other than it was an unexpected event." Tr. 108. Luiz Mendez testified that he was told "[t]hat's the way some children are born." Tr. 67. Prior to reading the newspaper article, no one had ever suggested to Luiz Mendez that the doctors may have been responsible for Tony's condition. Ex. F at 37, 39–40. Mr. Mendez attributed his son's problems to his being extremely ill at birth (common knowledge to a layman). Tr. 94.

Teresa Martinez, too, assumed that her grandson's condition arose from his ill status at birth. Tr. 34. When Tony was diagnosed as suffering from epilepsy, she was informed that "a lot of people have that." Tr. 31. She made no further inquiries as she assumed that her grandson's injuries arose not because of actions of the Madigan doctors but because Tony was in such poor health at birth—a situation which often arises on its own in the absence of any mistreatment. Tr. 34.

This impresses us: In light of the credible explanations given to Teresa Martinez and Luiz Mendez, and noting that the birth of a handicapped child often occurs in the absence of medical fault, that plaintiff did not know that the acts of the Madigan doctors may have caused Tony's injuries.

### 2. Objective Analysis

We go further and inquire whether under all the circumstances here revealed plaintiff should have been aware that the doctors' acts may have caused Tony's injuries—in other words, whether a reasonable person in plaintiff's position would have made further inquiry and discovered that the medical services performed may have played a part in Tony's unfortunate development.

Judge Nickerson of the Eastern District of New York confronted a strikingly sim-

ilar situation in *Lee v. United States,* 485 F.Supp. 883 (E.D.N.Y.1980). In *Lee,* air force doctors delivered a baby by Cesarian section. Immediately upon birth, the baby experienced seizures, respiratory distress and had fluid in her lungs. The physicians told the father that they did not know why the baby had fluid in her lungs, but " 'because of the aspiration syndrome and because of the delivery and the possibility of lack of oxygen' her prognosis was guarded and her neurological progress was slow." 485 F.Supp. at 885. The baby was brain damaged and retarded. Three and one half years later, upon moving to a new state and changing doctors, the Lees were first informed of a possible connection between the doctors' services during delivery and the condition of their daughter. They filed a claim with the government.

Judge Nickerson concluded that the case was not time barred; that the plaintiffs acted reasonably in not suspecting that the doctors may have caused their child's injury:

> [b]efore that date [the parents] admittedly knew that lack of oxygen to the brain could cause damage and that Kristen had stopped breathing due to the filling of her lungs with fluid. But the doctors at the Base Hospital did not volunteer that their acts had led to that condition, and he claims that when he asked the doctor at Smith Hospital why Kristen had fluid in her lungs the doctor responded that he did not know. Lee says it was not until May, 1975 that he knew that Kristen's condition was due to "an insult at birth" and not until January 1977 that he became aware that the manner of delivery caused the fluid to accumulate in the lungs.... When Lee was told by the doctor at Smith Hospital that he did not know what caused the fluid, Lee could reasonably have believed that the condition was wholly unrelated to anything the doctors did.

*Lee,* 485 F.Supp. at 886–87.

Cases time barring claims holding that a reasonable person would have realized earlier that the cause of the injury may have been attributable to another's act, generally involve a situation where the circumstances of the injury would arouse one's curiosity.

For example, in *Arvayo v. United States,* 766 F.2d 1416 (10th Cir.1985), plaintiffs presented their five month old son to the air force base hospital complaining of crankiness and fever. A doctor there diagnosed the problem as upper respiratory infection. One day later the infant returned to the base hospital where an emergency room doctor diagnosed the condition as bacterial meningitis. Almost three years later, the Arvayos filed a claim with the government.

The court, time barring the action, held that a reasonable person in the Arvayos' position "with the knowledge of two drastically different diagnoses in a twenty-four hour period, with the concommitant likelihood of brain damage, would have made *some* type of inquiry." 766 F.2d at 1422 (emphasis in original); *see also Camire v. United States,* 489 F.Supp. 998 (N.D.N.Y. 1980) (Court held parents acted unreasonably in not inquiring when baby was diagnosed first as having a cold and "cutting teeth" then eleven days later was rediagnosed as suffering from meningitis in an advanced stage of three or four weeks).

Here, Luiz Mendez and Teresa Martinez were presented with a very sick infant who required continuous attention as he grew. They were informed that some babies were born that way. No event occurred from the time of birth to the time of reading the newspaper article that would have stimulated a reasonable person in claimant's position to inquire further as to the true source of the injury. Rather, we believe Mr. Mendez and Mrs. Martinez only knew, or only should have known, that Tony was afflicted with serious illness complications which often arise from natural causes and not from improper handling.

We cannot require that knowledge of serious injury alone should cause a reasonable person to delve further into the cause of the injury. To do so would undermine *Kubrick.* The Supreme Court specifically demands that two distinct phases of awareness must be satisfactorily arrived at be-

fore a duty will be imposed on a plaintiff to make intelligent inquiry in the community as to whether medical treatment was negligently administered. To say that knowledge of injury alone should stimulate inquiry as to cause and consequently inquiry as to whether the treatment was negligent would completely bypass and obliterate the second requirement.

Further, were we to hold that knowledge of a serious injury alone should spur one to search for its cause and hence begin the running of the statute of limitations, we would encourage the following outlandish result:

> any time someone suffered pain or illness or death in a [government] hospital, he (or in the case of death his survivors) would request his hospital records to see whether diagnosis or treatment might have played a role in his distress—whether, that is, the harm might have been "iatrogenic" (doctor caused). He could not wait till he had reason to think he had suffered any iatrogenic harm; the two years might have run. We do not think such behavior should be encouraged, or that anything in *Kubrick* requires us to encourage it.

*Drazan*, 762 F.2d at 59 (Posner, J.).

What we have before us compels the conclusion that neither Luiz Mendez nor Teresa Martinez knew or should have known that Tony's injuries may have been caused by actions of the army base doctors rather than by natural causes.

We note that plaintiff's receipt in February, 1979, of Tony's medical charts does not satisfy the knowledge requirement of *Kubrick*, as defendant suggests. First, plaintiff did not possess Kyong Mendez's chart which details the delivery procedure until 1982—probably because only Tony's chart was requested. Further, from Tony's charts "neither plaintiff nor [Luiz Mendez] possessed any medical knowledge that would enable them to attribute any significance to these records." *Wilson v. United States*, 594 F.Supp. 843, 848 (N.D. Ala.1984); Tr. 40–41.

It is common experience to constantly observe that people accept tragic happenings as one of the natural consequences of living—"that's life, sad but nothing unusual." This acceptance alone blunts inquiry as to the causes of misfortune. It may very well be that others might be prompted to learn the true cause of misfortune—"what brought it on?"

What we are endeavoring to point out is that the totality of the material before us does not furnish full details addressed to the essential second phase that *Kubrick* makes indispensable. At trial there will be ample opportunity to delve into this essential element. If the proof at that time (even if offered at the commencement of trial) establishes this vital factor to the degree the law makes imperative, we would have no alternative to directing a dismissal of the complaint and awarding judgment in favor of the government.

## CONCLUSION

At this point of the litigation, we have no alternative but to deny the motion.

SO ORDERED.