Barbara **GESS, et al., John Roberts, Sr., et al., Joseph Givens, et al., Patrick G. Roberts, et al., Steven Fowler, et al., David Barber, et al., Jay Dehaai, et al., Cheryl Pretiger Toms, et al., Alphonso Barnes, et al., Joseph Warrick, et al., Connie Mullen, et al., Donald Gregory Sharpe, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civil Action Nos. 93–D–0913–N, 93–D–1139–N, 93–D–1140–N, 93–D–1391–N to 93–D–1395–N, 94–D–0326–N, 94–D–1199–N, 94–D–1200–N and 94–D–1201–N.

United States District Court,
M.D. Alabama,
Northern Division.

Oct. 2, 1995.

Leonard Gilbert Kendrick, Randolph B. Moore, III, George Lamar Beck, Jr., William Terry Travis, Montgomery, AL, for plaintiffs.

Jeffrey Axelrad, Benjamin·Franklin Station, Washington, DC, Kenneth E. Vines,

Redding Pitt, Leura J. Garrett, U.S. Attorneys Office, Montgomery, AL, Lawrence A. Klinger, Gail K. Johnson, Heather S. Call, U.S. Dept. of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court are Defendant United States of America's (hereafter "United States") motions to dismiss or, in the alternative, motions for summary judgment and the Plaintiffs' cross-motion for summary judgment.[1] Concomitantly, the United States submitted briefs in support of said motions. Plaintiffs filed responses and supporting briefs in opposition to the United States' motions.

Because the motions involve similar issues and arise from the same set of facts, the court will consolidate the· motions and address them simultaneously. . After careful consideration of the arguments of counsel, the relevant case law and the record as a whole, the court finds that the United States and Plaintiffs' motions for summary judgment are due to be denied.

### JURISDICTION & VENUE

Plaintiffs predicate liability under 28 U.S.C. § 2401, *et seq.*, the Federal Tort Claims Act (hereafter the "FTCA"). Subject-matter jurisdiction, thus, is proper pursuant to 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the ... laws ... of the United States." 28 U.S.C. § 1331. Personal jurisdiction and venue are not contested.

---

1. When the movant submits a 12(b)(6) motion for failure to state a claim upon which relief can be granted and "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...." Fed.R.Civ.P. 12(b). In ruling on the United States' motions, the court has considered the volumes of evidence submitted by the parties and, thus, will address the issues raised under the summary judgment standard.

The United States has moved for summary judgment as to the following eight actions: Civil Action Nos. 93–D–913–N (Gess); 93–D–1140–N (Givens); 93–D–1391–N (P. Roberts); 93–D–1392–N (Fowler); 93–D–1393–N (Barber); 93–D–1395–N (Toms); 94–D–1199–N (Warrick); and 94–D–1201–N (Sharpe). Plaintiffs' motion for summary judgment pertains to Civil Action Nos. 93–D–913–N (Gess), 93–D–1139–N (J. Roberts), 93–D–1140–N (Givens), 93–D–1391–N (P. Roberts), 93–D–1392–N (Fowler), 93–D–1393–N (Barber), 93–D–1394–N (DeHaai), 93–D–1395–N (Toms), and 94–D–326–N (Barnes).

## FACTUAL BACKGROUND

This is an action under the FTCA for injuries sustained by eleven newborn infants and one adult while patients on the obstetrics ward at a United States Air Force hospital in Montgomery, Alabama. In these consolidated cases, Plaintiffs seek recovery from the United States for physical complications allegedly caused by a "medical technician's" malicious injection of lidocaine into the newborn infants and one adult, the latter of whom had just undergone a cesarean section.

In urging summary judgment as to eight of the twelve actions, the United States does not challenge the merits of the claims but raises two affirmative defenses. Specifically, the United States asserts that the applicable statute of limitations bars seven of the lawsuits. Plaintiffs counter by arguing that although the applicable limitations statute may have run, equitable tolling should apply and, thus, save their actions. As to the remaining action, the United States contends that the minor's parents signed a release relinquishing all rights to now assert a legal claim against it.

Plaintiffs, on the other hand, have moved for summary judgment on the merits and assert that there is no genuine issue of material fact and that they are entitled to prevail as a matter of law. For clarity and organizational purposes, the court will set forth findings of fact as to each Plaintiff and then make conclusions of law.

### Gess Plaintiffs

On July 29, 1988, Sharon Gess gave birth to Melanie Gess (hereafter "Melanie") while confined to the obstetrics ward of the Air University Regional Hospital (hereafter the "AURH"), Maxwell Air Force Base (hereafter "Maxwell"), Montgomery, Alabama.[2] Plaintiffs Lt. Col. William and Barbara Gess (hereafter the "Gess Plaintiffs") contend that while a newborn infant in the AURH nursery, Melanie sustained injuries on or about July 30, 1988. Specifically, the Gess Plaintiffs contend that the United States Air Force acting for the United States allowed the administration of toxic agents into Mela-

nie, which caused apnea, anoxia, acute respiratory distress and other medical problems.

The facts underlying the Gess Plaintiffs' legal assertions are as follows: On or about January 19, 1989, the Gess Plaintiffs met with Dr. Stanford P. Sadick (hereafter "Dr. Sadick"), the Director of Hospital Services at the AURH. Lt. Col. Gess' Dep. at 20. During this meeting, Lt. Col. Gess stated that "we [Lt. Col. and Ms. Gess and their daughter Sharon] were told of the incident of tampering and that our baby was part of it." *Id.* at 27. Dr. Sadick also mentioned that it was possible that Melanie had been injected with lidocaine. *Id.* at 30. Lt. Col. Gess further claims that during this meeting, Dr. Sadick said the lidocaine "had gone right through her blood and that she [Melanie] was fine— that she would be just fine." *Id.* Thereafter, the Gess family talked to investigators with the United States Air Force Office of Special Investigations (hereafter the "OSI"), who also informed them that it was possible that Melanie had been injected with lidocaine. *Id.*

After their meeting with Dr. Sadick and the OSI, the Gess Plaintiffs consulted Steven Schmitt (hereafter "Schmitt"), an attorney who practices law in Tallassee, Alabama, about the possibility of bringing an action against the United States for the injuries Melanie sustained. *Id.* at 44, 66. The Gess Plaintiffs also articulated concerns about the possible long-term effects of the injection(s). Lt. Col. Gess signed a contingency contract with Schmitt. However, Schmitt later decided not to take the case and stated that the medical records showed no permanent injury. *Id.* at 67–68. Lt. Col. Gess asserts that as a result of Schmitt's representation, he and his wife decided not to pursue a lawsuit; however, Lt. Col. Gess admits that he was aware that any claim against the United States was subject to a limitations period. *Id.* Additionally, the Gess Plaintiffs contend that United States doctors assured them that although Melanie had been injected with lidocaine, she would not suffer any adverse health consequences and that the Air Force

2. At the time of Melanie's birth, Sharon Gess was the minor daughter of Plaintiffs Lt. Col. William and Barbara Gess, who have since legally adopted Melanie as their child. Hereafter, all references to "Ms. Gess" are to Barbara Gess.

would take care of the medical expenses. Gess' Br. in Opp. to Mot. to Dis. at 5–6; Ms. Gess' Dep. at 9.

The Gess Plaintiffs also claim that they saw the newspaper article regarding the malfeasance which had occurred at the AURH, but that because of the reassurances received from the OSI and Commander of the AURH that Melanie would suffer no permanent harm, they disregarded the article. Gess' Br. in Opp. to Mot. to Dis.; Ms. Gess' Dep. at 10, 18. Ms. Gess revisited the OSI and was told that Melanie was progressing favorably, despite occasional vomiting. Gess' Br. in Opp. to Mot. to Dis. at 6; Ms. Gess' Dep. at 6.

Subsequently, civilian physicians treated Melanie when she experienced further complications. Dr. Molly Walker (hereafter "Dr. Walker") examined Melanie when her vagina closed and treated Melanie for vomiting. Ms. Gess testifies that she informed Dr. Walker that Melanie had been injected with lidocaine but that Dr. Walker expressed no causal nexus between Melanie's symptoms and the lidocaine injections. Ms. Gess' Dep. at 20, 21. Dr. Wyndell Galyard (hereafter "Dr. Galyard") examined Melanie for stomach problems but opined that nothing was wrong with her. Dr. Galyard did not refer Melanie to other physicians. *Id.* at 26. Ms. Gess asserts that through the four examinations that Melanie underwent at Monsky Clinic, not one physician stated that lidocaine possibly precipitated Melanie's complications.[3] In fact, all the physicians at the Monsky Clinic indicated that Melanie was medically fine. *Id.* at 30, 39–41. Similar to the testimony given by her husband (Lt. Col. Gess), Ms. Gess states that after informing Schmitt of the United States' reports and preliminary findings, he decided not to take the case "because he could not show enough." *Id.* at 33.

On July 17, 1992, the Gess Plaintiffs filed a FTCA claim pursuant to 28 U.S.C. § 2401(b).[4] Obtaining no relief from the United States as to the administrative claim,

the Gess Plaintiffs instituted this action on July 22, 1993, alleging that the United States acted negligently in failing to supervise its agents or implement a program, which would prevent injury to those entrusted to the care of the AURH. The Gess Plaintiffs further aver that the Air Force failed to maintain and administer a quality assurance program in a medically acceptable manner.

**Roberts Plaintiffs**

On July 20, 1988, Terry Roberts (hereafter "Ms. Roberts") gave birth by cesarean section to Emily Roberts (hereafter "Emily") at the AURH. On July 22, 1988, Ms. Roberts allegedly was informed by Dr. Carol Green, a pediatrician at the AURH, that Emily experienced a cessation in breathing and turned blue twice. Roberts' Aff. at 1. Following this incident, Emily remained at the AURH four days. *Id.*

Emily's parents testify that since birth, Emily has endured ear infections that required surgical tubes, has undergone several ear operations and may have a permanent 35% hearing loss in one of her ears. *Id.* Other complications experienced by Emily and allegedly attributable to the care received at the AURH include the following: a urinary tract infection, which is purportedly an uncommon phenomenon in children; equilibrium problems; and frequent colds and viruses. *Id.* at 1–2.

After a family member read a news article in February 1989, regarding investigations underway at the AURH, the Roberts contacted the AURH Commander and communicated with the United States Air Force Office of Special Investigations (hereafter the "OSI"). At that time, the Roberts allegedly were informed that Emily was one of several children believed to have been injected with lidocaine.

The Roberts assert that during their conversation with the AURH Commander, the Commander stated that OSI investigators had determined that "something" was wrong.

---

**3.** The Air Force referred the infants suspected to have been injected with lidocaine to the David B. Monsky Children Center at Baptist Medical Center in Montgomery, Alabama, for more detailed examinations.

**4.** Before a plaintiff may bring a lawsuit under the FTCA, he or she first must file a claim with the appropriate government agency. *See Free v. United States,* 885 F.2d 840, 842 (11th Cir.1989).

*Id.* at 2. According to the Roberts, however, the OSI investigators indicated that the hospital's suspicions were not provable and probably would never be proven; therefore, nothing could be done about the incidents that allegedly transpired. Since Emily had not been transferred to the Monsky Clinic at Baptist Medical Center, as were other alleged injected children, the OSI investigators concluded that she was not involved, even though she was supposedly injected with a harmful substance causing adverse side effects.

### Fowler Plaintiffs

Teresa Fowler (hereafter "Ms. Fowler") gave birth to Corey Fowler (hereafter "Corey") on September 27, 1988 at the AURH. At approximately 7:00 p.m. on September 28, 1988, Corey was discovered bleeding from his nose and mouth. The next day, Corey was gurgling, irritable, with low respirations, and once more allegedly bleeding from the nose and mouth. The Air Force then transferred Corey to Baptist Medical Center, where he remained for approximately three weeks.

Following Spec. 4 Steven Fowler's change of duty stations to Mainz, Germany[5] and around February 1989, a Colonel from Wiesbaden Air Base Hospital in Germany telephoned the Fowlers and told them that he had been contacted by a Colonel at Maxwell Air Force Base. Ms. Fowler's Aff. at 2. This Colonel requested to meet with the Fowlers. *Id.* The Colonel informed them that, according to Maxwell officials, an employee at Maxwell may have intentionally and criminally injured Corey. *Id.* at 2–3; Ms. Fowler's Dep. at 28–29. During this meeting, the Colonel requested that the Fowlers sign a form to have certain medical records released to the United States, which they signed. *Id.* at 27.

The day after the meeting with the Colonel at Wiesbaden Air Base Hospital, Ms. Fowler telephoned the AURH at Maxwell and spoke with "a Colonel," whose name she does not now remember. *Id.* at 14. This Colonel confirmed what the Colonel at Wiesbaden had said but then told her that he was "not at liberty" to reveal any details about the actions taken against her son. *Id.* at 14–15. According to Ms. Fowler, he assured her several times that her son "should be perfectly all right." *Id.* at 15–17.

About a week later on May 16, 1989, the Fowlers received in the mail from the Surgeon General of the United States a second form, which if signed, would release the United States from liability, i.e., a "general release." *Id.* at 27–28. Ms. Fowler then contacted the office of the Staff Judge Advocate at Wiesbaden regarding the "general release." She spoke with a female lieutenant who apparently told her that the Judge Advocates were not authorized to provide any legal advice but that she should contact an attorney. *Id.* at 29–30, 32. She suggested, however, that Ms. Fowler return the "general release" unsigned.[6] *Id.* at 29.

Based upon this advice, Ms. Fowler returned the release unsigned along with a letter addressed to Major Oaks[7] and dated June 6, 1989. In this letter, Ms. Fowler expressed that she had endured the worst twenty-three days of her life. Ms. Fowler also noted that she intended to contact legal counsel in Germany and also in the United States. Ms. Fowler concluded the letter by stating that she was interested in having her rights, as well as her son's rights, vindicated. *See* Ms. Fowler's Dep., Ex. C attached thereto (letter to Major Oaks). Ms. Fowler also testified that she never heard anything else from the AURH about her son or the OSI investigation nor was she ever told that her son may have been injected with lidocaine. *Id.* at 17–18.

Ms. Fowler further asserts that since birth, Corey has suffered from periodic throat spasms when he sleeps, and he sounds as if he is "attempting to suck on something."

---

**5.** Spec. 4 Steven Fowler, Corey's father, was transferred to Germany shortly before Corey's birth. Ms. Fowler and Corey joined him in Germany when Corey was approximately six or seven weeks old.

**6.** The court notes that this is the most appropriate and proper advice given to any of the Plaintiff-parents or adult Plaintiff in this case by Air Force medical officers and personnel of the OSI in general, or Judge Advocates in particular. The lieutenant should be commended.

**7.** At her deposition, Ms. Fowler testified that she could not remember who Major Oaks was. Ms. Fowler's Dep. at 31.

Ms. Fowler's Aff. at 1. The Fowlers filed an administrative claim on March 3, 1993, and subsequently filed Civil Action No. 93–D–1392–N.

## Barber Plaintiffs

Tiffany Michele Barber (hereafter "Tiffany") was born to Plaintiffs David and Delight T. Barber on July 9, 1988 at approximately 7:12 p.m. Around 9:30 p.m., Tiffany began experiencing bradycardia (slow heartbeat) and cyanosis, a condition which exhibits blue coloration of one's skin due to a lack of oxygen. Tiffany then was treated with oxygen and stimulation. Tiffany remained on oxygen for the next two days although she was no longer cyanotic. The oxygen was discontinued on July 11, 1989, and Tiffany was discharged from the AURH on July 13, 1989.

In March 1989, Tiffany's parents were interviewed by the OSI at Maxwell regarding Tiffany's episode at the AURH. Ms. Barber's Dep. at 8. The Barbers were told that their child was one of several babies whom had experienced health difficulties at the AURH in 1988 and that the OSI was conducting an investigation. *Id.* at 9. They were purportedly told that they would be contacted following the investigation. *Id.* According to the Barbers, they were not told that Tiffany had been injected with lidocaine and were never contacted by OSI following the investigation. *Id.* at 10. The Barbers filed an administrative claim on July 8, 1992, and later instituted Civil Action No. 93–D–1393–N.

## Schoen Plaintiff

This action is the only one based on alleged injuries sustained by an adult. On November 1, 1988, Cheryl Pretiger Schoen, now Cheryl Pretiger Toms (hereafter "Schoen"), underwent a cesarean-section delivery and gave birth to Shawn C. Pretiger (hereafter "Shawn") at approximately 8:00 a.m. Immediately following delivery, Schoen complained of itching and received an intramuscular injection of Benadryl around 5:00 p.m. Schoen Aff. at 1. At about 9:30 p.m. that same day, the itching returned. When the "medical technician" came to her room, she requested more Benadryl to relieve the itching. *Id.*

The "medical technician" then allegedly injected Schoen with a substance, and, according to Schoen, areas around her hand began to burn. Schoen asserts that she voiced concerns but that the "medical technician" assured her that the burning sensation was normal. Schoen began to cough violently and was instructed by the "medical technician" to "go with it." Schoen's Dep. at 12. She then became unconscious and medical emergency treatment began. While unconscious, Schoen's body assumed a ball position, and the nursing staff had to physically manipulate her body to straighten it. Schoen's Aff. at 2. Two hours later when she regained consciousness, the attending physicians told her that she may have had a reaction from the epidural. Schoen's Dep. at 19. Either that evening or the next day, however, Schoen said she spoke with an anesthesiologist who told her that her symptoms were not characteristic of an adverse reaction to an epidural.

Approximately two to three weeks after Shawn's birth, Schoen met with OSI investigators and gave a statement concerning her "incident." *Id.* at 13. Schoen states that at this meeting, the OSI investigators did not provide her with any information but simply wanted to know what allegedly had happened to her. Two additional interviews followed in December, one of which was taped.

Subsequently, in January 1989, an AURH administrator informed Schoen that a drug had been placed in her I.V. after the cesarean-section delivery of her son. *Id.* at 21–22, 36–37. Purportedly, the administrator would not reveal the name of the drug but assured Schoen that there would not be any adverse health effects. He also told Schoen that other patients and newborn babies were involved and that a press release addressing the events would be forthcoming. *Id.* at 36–37.

According to Schoen, she contacted an attorney in either January or February 1989, after viewing a television news story regarding the inexcusable, if true, occurrences within the OB ward at the AURH. However, Schoen did not pursue an administrative remedy at that time.

Schoen also claims that after the investigation in 1990, she asked the OSI if she could view her medical records to identify the drug with which she had been injected. According to Schoen, she was told that she had no physical deformities from the injection and, as a result, had no case. *Id.* at 27. Based upon this representation, she decided not to pursue a legal action. Nonetheless, she continued to try and obtain her medical records but was not provided with copies until "several years" later, which was sometime at the end of 1992. Schoen's Aff. at 2; Schoen's Dep. at 45. The medical records, she asserts, are incomplete and contain no information about what occurred to her while a patient at the AURH. Schoen relocated to California in 1990 following her divorce and remarriage.

Schoen asserts that immediately after Shawn's birth, she began suffering from bouts of constipation. Then about a year after Shawn's birth, she began experiencing stomach cramps, migraine headaches and a numb spot in her back. Schoen's Aff. at 3; Schoen's Dep. at 41. On March 30, 1993, Schoen filed an administrative claim with the United States Air Force and later this action. In her complaint, Schoen alleges that she sustained injuries arising from the purported negligence of the United States. Schoen contends that this incident was, from the beginning, and remains of great concern to her. Schoen states, "I have had to live for the last four-and-one-half years knowing that I was injected with a substance detrimental to my body, but not knowing the name of the drug or substance." Schoen Aff. at 2–3.

The following transpired at Schoen's deposition regarding her efforts to discover the origin of her injuries:

Q. Have you ever asked any other doctor whether or not there's any side effects from this injection that you may have received in your I.V.?

A. No, because I didn't know what the injection was. I spoke to doctors in California. Explained to them what I knew, that something happened. Could my stomach pains be from that? They said they don't know. They don't know what it

was. They don't see anything in my records saying that it was.

Q. When is the first time you heard either Lidocaine or Xylocaine or whatever in connection with this case?

A. From Dr. Beck's office due to the Redner [8] case.

Schoen's Dep. at 46–47.

### Warrick Plaintiffs

Quinton Warrick (hereafter "Quinton") was born on August 29, 1988. At approximately 12:20 a.m. on the morning following his birth, Quinton had an elevated temperature, and, at approximately 3:45 a.m., he appeared "gray and mottled." The AURH personnel administered oxygen and conducted a full septic work-up, which included a lumbar puncture, chest x-ray and blood cultures. After experiencing respiratory distress at around 6:00 a.m., Quinton received I.V. antibiotics. At approximately 3:00 p.m. on August 30, 1994, Quinton was transferred to Baptist Hospital. Baptist Hospital discharged Quinton on September 6, 1988.

In January 1989, the OSI contacted Daphne Warrick, Quinton's mother (hereafter "Ms. Warrick"), who was then living in North Carolina, and requested that she come to Montgomery to meet with the OSI. Upon arrival in Montgomery, the OSI informed Ms. Warrick that "there was a possibility [Quinton] could have been injected with something." Ms. Warrick's Dep. at 11–12, 26–27. Ms. Warrick also had read the *Montgomery Advertiser* newspaper article regarding the alleged malfeasance occurring at Maxwell. *Id.* at 38–39.

In their administrative "Claim for Damage, Injury, or Death" dated (by Ms. Warrick) December 23, 1993, the Warricks alleged that the United States was negligent or wanton in the delivery and post-delivery care of Quinton. The Warricks also alleged that the United States negligently or wantonly operated the nursery so as to cause Quinton injury. After their claim was denied, Quinton's parents—Army Sergeant Joseph and Daphne Warrick—filed Civil Action No. 94–

---

**8.** The Redner family filed an action against the United States for similar harm. The Redners settled their cause. *See* U.S. Memo. in Support of Mot. to Dis. the Barbers' lawsuit at 9 n. 3.

D–1199–N on September 29, 1994 seeking damages for injuries purportedly received by Quinton in the AURH nursery shortly after his birth.

### Sharpe Plaintiffs

Deborah Sharpe (hereafter "Ms. Sharpe") was 29 years of age when she gave birth to Asia. While Ms. Sharpe had two previous miscarriages, Asia's delivery was uneventful except for indications of fetal bradycardia (slow heart rate) approximately thirty minutes before delivery. At approximately 12:38 a.m. on November 21, 1988, Asia was delivered and given oxygen for approximately ten minutes. At around 2:45 a.m., Asia was observed as having tachycardia (rapid heart rate). AURH personnel again administered oxygen to relieve the problem.

Asia's breathing complications persisted and at approximately 4:30 p.m., a full septic work-up including a lumbar puncture was performed. Thereafter, an I.V. with antibiotics was commenced, but Asia's breathing problems did not subside. At 6:00 p.m., she was transferred to Baptist Hospital and remained there until December 2, 1988.

Thereafter in January 1989, Ms. Sharpe communicated with OSI representatives and was told that "[t]hey were doing an investigation to find out if there was any foul play. They [OSI] said they felt there might be a guy out there injecting Lidocaine into the babies." Ms. Sharpe's Dep. at 11–12, 19. Prior to Ms. Sharpe's meeting with the OSI, Sergeant Donald (hereafter "Sgt. Sharpe")[9] and Ms. Sharpe met with Maxwell Hospital officials who also advised them of foul play. *Id.* at 13–14.

Sgt. Sharpe testifies, via deposition, that the OSI assured him that they would keep in contact regarding the progress of the investigation, but no one communicated with them during the OSI's investigation. Sgt. Sharpe's Dep. at 9. Sgt. Sharpe contends further that he initiated contact with the OSI in May 1989, and the OSI expressly stated that Asia was not involved and that the case was closed.[10] *Id.* at 15–16.

The Sharpes filed an administrative claim on February 3, 1994,[11] and this action on September 15, 1994. The Sharpes contend that Asia sustained injuries resulting from the negligent administration of lidocaine or other toxic agent while she was a newborn in the AURH nursery. The Sharpes charge the United States with negligent hiring, supervision, training and/or management at the AURH and further allege that the United States' negligence proximately caused Asia to suffer apnea, anoxia, acute respiratory distress and other problems.

### Givens Plaintiffs

Toyanika Raschel Givens (hereafter "Toyanika") was born at the AURH on September 19, 1988. On September 21, 1988, Toyanika experienced respiratory problems and seizures and had to be transferred to Baptist Hospital and then University of Alabama at Birmingham Hospital. She was hospitalized for a total of thirty days.

On September 5, 1989, Sergeant Joseph Givens (hereafter "Sgt. Givens") filed an administrative tort claim, alleging medical malpractice and requesting $500,000 in damages for personal injuries sustained by his daughter, Toyanika. On May 3, 1990, the Givens received a letter from Lt. Col. Hervey A. Hotchkiss (hereafter "Lt. Col. Hotchkiss"), a judge advocate and the chief of the Tort Branch Division, Office of the Judge Advocate General, Headquarters United States Air Force. In the letter, Lt. Col. Hotchkiss stated, in part, that "[t]here is insufficient evidence to suggest that the Air Force had any knowledge that one of its members had a propensity for committing the acts alleged or that the Air Force should have been on notice of such misconduct at an earlier date." Givens' Ex. 6, attached to U.S.' Mot. Summ.J. Nonetheless and "in the spirit of cooperation," Lt. Col. Hotchkiss stated that the Air Force had authorized $25,000.00 in settlement of their medical malpractice claim. *Id.* He continued by stating that "[o]ur offer represents the maximum amount which the Air Force is authorized to approve under the

---

**9.** Sgt. Sharpe is Asia's father.

**10.** At the time of his conversation, Sgt. Sharpe had been restationed to Guam.

**11.** They amended their claim on March 24, 1994, increasing the amount of the damages from $10,-000,000 to $15,000,000.

provisions of the Federal Tort Claims Act." *Id.*

The Givens signed the settlement agreement on May 9, 1990 "individually" and as Toyanika's "parents, guardians and next friends."[12] Givens' Ex. 7, attached to U.S.Mot.Summ.J. The settlement agreement states that the Givens agree to accept $25,000.00 from the Air Force "in full satisfaction and final settlement of any and all claims which [they] have or may have against the United States … for personal injuries sustained as a result of alleged medical malpractice at Maxwell AFB following the birth of TOYANIKA R. GIVENS, and for any and all damages, losses and injuries proximate and consequent thereto." *Id.* The Givens returned the settlement agreement with a letter and therein stated that "[w]e willingly accept the proposed amount of $25,000.00 as the final settlement for this claim," and "we graciously accept the offer." Givens' Ex. 12, attached to U.S.' Mot.Summ.J.

## SUMMARY JUDGMENT STANDARD

■ On a motion for summary judgment, the court is to construe the evidence and factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court of the United States has explained,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

12. When the Givens signed the settlement agreement, Sgt. Givens was stationed at Fort Ord,

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The trial court's function at this stage of the case is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510.

■ The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* at 587, 106 S.Ct. at 1356. *See also Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11.

California. The settlement agreement reflects a California address.

## DISCUSSION & ANALYSIS

The court first will address the United States' motions for summary judgment and divides its analysis into two sections. The first section pertains to the statute of limitations defense, and the second focuses on the settlement and release. The court then will discuss Plaintiffs' motion for summary judgment.

### I. The United States' Motions For Summary Judgment

#### A. Statute of Limitations

Pursuant to 28 U.S.C. § 2401(b), tort claim actions against the United States are deemed forever barred unless such claims are brought to the appropriate federal agency within two years after the accrual of the claim.[13] Generally, statutes of limitations "require the assertion of claims within a specified period of time after a notice of the invasion of legal rights." *Urie v. Thompson,* 337 U.S. 163, 170, 69 S.Ct. 1018, 1025, 93 L.Ed. 1282 (1949); *Quinton v. United States,* 304 F.2d 234, 241 (5th Cir.1962).[14] Statutes of limitations are products of enlightened jurisprudence, *United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979) (quoting *Wood v. Carpenter,* 101 U.S. 135, 139, 25 L.Ed. 807 (1879)), and represent a ubiquitous legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that "the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Id.* (quoting *Order of Railroad Telegraphers v. Railway Express Agency, Inc.,* 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944)).

■ It is well established under the FTCA that a plaintiff's minority does not toll the running of the statute of limitations. *Leonhard v. United States,* 633 F.2d 599, 624 (2d Cir.1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); *Camire v. United States,* 489 F.Supp. 998 (N.D.N.Y. 1980); *Mendez v. United States,* 655 F.Supp. 701, 705 (S.D.N.Y.1987). When a plaintiff is a minor, his or her parent's knowledge of the injuries is imputed to him or her. *Zavala v. United States,* 876 F.2d 780, 782 (9th Cir. 1989) (citing *Fernandez v. United States,* 673 F.2d 269, 271 (9th Cir.1982)). Parents "have a legal duty to take action" on behalf of their injured minor children, and it is not the court's function to question the parent's decision not to do so. *Landreth v. United States,* 850 F.2d 532, 534 (9th Cir.1988), *cert. denied,* 488 U.S. 1042, 109 S.Ct. 866, 102 L.Ed.2d 990 (1989) (citations omitted). A child is bound by his or her parents' neglect in filing a claim. *Zavala,* 876 F.2d at 782 (citing *Pittman v. United States,* 341 F.2d 739 (9th Cir.), *cert. denied,* 382 U.S. 941, 86 S.Ct. 394, 15 L.Ed.2d 351 (1965)). Plaintiffs concede that the statute of limitations is not normally tolled during one's minority. Instead, Plaintiffs aver that equity requires a cessation of the limitations period in the instant cases.

■ As a general rule, the two-year tort limitations period begins to run when a plaintiff is injured. *Price v. United States,* 775 F.2d 1491, 1493 (11th Cir.1985) (citing *Kubrick,* 444 U.S. at 120, 100 S.Ct. at 358). However, as the *Price* court expressed, the foregoing principle in medical malpractice actions would yield unjust results for two reasons:

First, if the injury takes a long time to manifest itself, the plaintiff might not discover the injury until more than two years after the injuries occurred. Second, the plaintiff might not suspect that the injury caused by a person who treated [him or] her, particularly where the plaintiff continues to be treated by the person who caused the injury.

775 F.2d at 1493 (brackets supplied).

Consequently, the Supreme Court of the United States has held that in medical malpractice actions under the FTCA, a claim accrues when the claimant discovers both the injury and its probable cause. *Kubrick,* 444 U.S. at 123–25, 100 S.Ct. at 360–61; *see also*

---

13. "A tort claim against the United States shall be forever barred unless it is presented … within two years after such claim accrues or unless action is begun within six months … of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b).

14. In the en banc decision of *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981), the Court of Appeals for the Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered before October 1, 1981.

*Zavala,* 876 F.2d at 782. In *Kubrick,* the plaintiff (hereafter "Kubrick") underwent leg surgery in April 1968 at a Veterans' Administration hospital and was administered an antibiotic (neomycin) to prevent infection. Approximately six weeks after discharge, Kubrick began experiencing hearing problems. In January 1969, a private physician obtained and examined Kubrick's hospital records and saw that he had been administered neomycin after surgery. The physician advised Kubrick that it was "highly possible" that his hearing loss was caused by neomycin. *Kubrick,* 444 U.S. at 111, 100 S.Ct. at 353–54.

Kubrick, however, failed to file an administrative claim until more than two years after the physician's diagnosis. The Court of Appeals for the Third Circuit allowed the action to commence, because Kubrick had filed an administrative claim within two years of being told that administration of neomycin was negligent:

> [E]ven though a plaintiff is aware of his [or her] injury and of the defendant's responsibility for it, the statute of limitations does not run where the plaintiff shows that "in the exercise of due diligence he [or she] did not know, nor should he [or she] have known, facts which would have alerted a reasonable person to the possibility that the treatment was improper."

*Id.* at 116, 100 S.Ct. at 356 (citation omitted) (brackets supplied).

The Supreme Court of the United States reversed. In finding that Kubrick's claim accrued in January 1969 when informed by his private physician that the probable cause of his hearing loss was the neomycin treatment, the Court disagreed with the lower court's reasoning:

> We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at the least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he had been wronged, and he need only ask. If he does ask and if the defendant has failed to live up to minimum standard of medical proficiency, the odds are that a competent doctor will so inform the plaintiff.

*Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359.

To constitute awareness of an injury, the first prong of the *Kubrick* analysis, a plaintiff need not realize or appreciate the full extent of his or her injury, *Mendez,* 655 F.Supp. at 705 (citing *Allen v. United States,* 527 F.Supp. 476, 491 (D.Utah 1981)), as the statute runs even though the eventual damage is uncertain, incalculable or unknown. *See Jastremski v. United States,* 737 F.2d 666, 670 (7th Cir.1984); *Robbins v. United States,* 624 F.2d 971, 973 (10th Cir.1980). Moreover, a plaintiff may inquire of those possessing superior knowledge about the extent of his or her injury once the plaintiff learns that he or she has experienced serious harm.

Under this first element, the court finds that each Plaintiff had knowledge that he or she had been harmed by the alleged malfeasance of the United States. The parents knew that their children had been injured when each child's physical condition was made known to the respective parent(s). This may or may not have been, however, the time at which the Plaintiffs became aware of the cause of injury.

The second element of *Kubrick* requires that a plaintiff possess knowledge of the cause of his or her injury. This element concerns "the act of the defendant which gave rise to the injury," not simply to the medical cause. *Lee v. United States,* 485 F.Supp. 883, 885 (E.D.N.Y.1980). For a claim to "accrue," the plaintiff must be "in possession of the critical facts that he [or she] has been hurt and who has inflicted the injury." *Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359. Mere knowledge that a person has suffered an injury does not constitute cognizance of the cause of injury.

It is well-established in the Eleventh Circuit that "claims for malpractice under the FTCA accrue when a claim-

ant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice." *Burgess v. United States*, 744 F.2d 771, 773 (11th Cir.1984) (citing *Coyne v. United States*, 411 F.2d 987 (5th Cir.1969)); *Beech v. United States*, 345 F.2d 872 (5th Cir. 1965); *see also Price*, 775 F.2d at 1494 (citing *Lavellee v. Listi*, 611 F.2d 1129 (5th Cir.1980)) (holding that a medical malpractice claim accrues under the FTCA when a plaintiff, in the exercise of reasonable diligence, is "aware of both [his or] her injury and its connection with some act of the.defendant"). While the FTCA statute is not tolled by ignorance resulting from the lack of diligence, "plaintiffs seeking to understand the cause of an injury may reasonably rely on advice and assurances by doctors." *Chamness v. United States*, 835 F.2d 1350, 1353 (11th Cir.1988) (citations omitted).

 ■ "Once the plaintiff discovers that her injury is probably attributable to some act of those who treated her, there is no (longer any) reason to toll the statute of limitations." *Price*, 775 F.2d at 1493. However, if a doctor lulls a plaintiff into an erroneous belief regarding the cause of his or her injuries and the exercise of reasonable diligence does not make the plaintiff aware that he or she has been injured by a particular defendant, the limitations period is subject to tolling. *See Chamness*, 835 F.2d at 1353.

In *Burgess*, another case decided under the FTCA, an attending physician at the United States Army Hospital at Fort Stewart, Georgia, broke an infant's clavicles to facilitate delivery of the newborn. This act occurred on September 5, 1978. The fracture injured the infant's right brachial plexus and caused Erb's Palsy, which is symptomized by paralysis of the upper arm. On September 8, 1978, the infant's discharge record read that the child had "[t]otal right brachial plexus palsy...." However, the mother was released on September 8, 1978, and given instructions on how to administer physical therapy to the child, but was not privy to this information. The plaintiffs in *Burgess* were reassured by medical personnel that all would be well with their son's arm. The record in *Burgess* revealed that it was not until the September 29, 1978 entry in the infant's record that a report was made

indicating a physician's opinion of possible nerve damage to the child's upper arm. The parents discussed the test results with a neurosurgeon on October 29, 1978. The United States contended that Plaintiffs' cause of action accrued on September 6, 1978, the date in which the parents gained knowledge that the child's clavicles had been broken, which according to the United States, was the only injury the child suffered.

Contrarily, the parent-plaintiffs alleged that the claim did not accrue until, at least, September 29, 1978, the date they were apprised of the resulting nerve damage. In rejecting the United States' argument, the *Burgess* court reversed the trial court's decision and noted that mere knowledge of an injury, in and of itself, does not constitute awareness of the cause. *Burgess*, 744 F.2d at 774. As the court further explained, any information regarding the resulting nerve damage was within the exclusive knowledge of the United States before September 29, 1978, and the parents were told nothing prior to this date that would lead a reasonable person to suspect a broken clavicle would cause Erb's Palsy. *Id.* at 774–75.

Here, the relevant Plaintiffs contend that they did not possess knowledge of the cause of their children's injury before the limitations period ran. Plaintiffs claim that although the United States suggests that the injuries to their children may have been caused by the malfeasance of a hospital agent, they were justified in not bringing an action against the United States at that time. Essentially, these Plaintiffs aver that the AURH agents implanted an erroneous notion that their children had suffered no long-term injury. Plaintiffs further contend that until Dr. Colan represented to them that they had a viable cause of action, reasonable diligence would have been futile. The court now turns to the individual contentions of the plaintiffs and focuses on the time at which each Plaintiff gained knowledged of the cause of the injuries.

### 1. *Gess Plaintiffs*

 ■ Initially, the court notes that the interest of justice aligns with a defendant when a plaintiff fails to file [his or] her action

in a timely fashion despite knowing, or being in a position to know, that the limitations period is running. *See e.g., First Alabama Bank v. United States,* 981 F.2d 1226, 1228 (11th Cir.1993); *Ross v. Buckeye Cellulose Corp.,* 980 F.2d 648, 661 (11th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 69, 130 L.Ed.2d 24 (1994). On the other hand, the balance of justice tilts in favor of a plaintiff when a defendant misleads him or her into allowing the statutory period to expire, *see Irwin v. Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 457–58, 112 L.Ed.2d 435 (1990); or when [he or] she has no reasonable way of discovering the wrong perpetrated against him or her, *see e.g., McBrayer v. City of Marietta,* 967 F.2d 546, 547 (11th Cir.1992).

The United States strenuously argues that *Kubrick* mandates an entry of summary judgment in its favor. As to the second prong of *Kubrick,* the United States contends that the Gess Plaintiffs were aware of the cause of Melanie's injuries more than two years prior to July 17, 1992, the date the administrative claim was filed. It is undisputed that the Director of Hospital Services at the AURH (Dr. Sadick) informed the Gess Plaintiffs on or about January 19, 1989 that Melanie "possibly" had been injected with lidocaine.

Hence, at first glance, it appears that the Gess Plaintiffs were "in possession of the critical facts that [Melanie] ha[d] been hurt and who ha[d] inflicted the injury." *Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359 (brackets supplied). Nonetheless, the court finds that *Kubrick* is distinguishable on one essential ground. While the United States, through its agent, told the Gess Plaintiffs of the purported lidocaine injection, there is evidence that the United States attempted to conceal the facts relating to causation. Specifically, the United States explicitly represented to the Gess Plaintiffs that Melanie would not suffer any health problems, thus, impliedly negating the causal relation between the injury and the injection. In *Kubrick,* there was no allegation that the United States had concealed any medical information from the plaintiff or lulled the plaintiff into an erroneous belief about the cause of injury. This fact alone raises a genuine issue of material fact as to the second prong of *Kubrick.*

Additionally, there is something to be said about the patient-physician relationship. The Gess Plaintiffs relied on the statement of Dr. Sadick, an Air Force physician, and should have been able to trust his representation that no long-term or harmful medical effects would ensue. From aught that appears at this juncture, Dr. Sadick arguably deliberately and falsely advised the Gess Plaintiffs, as well as the other Plaintiffs.

To find that the statute of limitations has run in this case would produce a manifest injustice. The *Price* court was speaking to this exact situation when it noted that equitable tolling should apply when "the plaintiff might not suspect that the injury caused by a person who treated [him or] her, particularly where the plaintiff continues to be treated by the person who caused the injury," in this case the Air Force. 775 F.2d at 1493. Accordingly, the court finds that equity compels the court to deny the United States' motion for summary judgment on the Gess Plaintiffs' cause of action.

 While the court's analysis could end here, the court will address a second argument raised by the United States. The United States further asserts that it cannot be blamed for the failure of other physicians to identify the cause of Melanie's physical symptoms. In support of this contention, the United States cites *Kubrick,* wherein the court stated that if a plaintiff "fails to bring suit because he [or she] is incompetently or mistakenly told that he [or she] does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant...." *Kubrick,* 444 U.S. at 124, 100 S.Ct. at 360. However, in *Chamness,* a case decided after *Kubrick,* the Eleventh Circuit expounded upon the aforementioned principle and implicitly recognized an exception:

The FTCA statute is not tolled by ignorance from a lack of diligence. However, a number of post-*Kubrick* cases have stressed that plaintiffs seeking to understand the cause of an injury may reasonably rely on advice and assurances by doctors. The Ninth Circuit has asserted: "Ordinarily, a plaintiff cannot be expected to discover the general medical cause of

his injury even before the doctors themselves are able to do so." *Rosales v. United States,* 824 F.2d 799, 805 (9th Cir.1987) (cause did not accrue where doctor was unable to diagnose retardation and did not mention IUD as possible source of injury). 835 F.2d at 1352. In following the reasoning of *Chamness,* the court finds that material factual disputes exist as to whether the Gess Plaintiffs exercised due diligence in trying to uncover the causal connection and whether Melanie's injuries were proximately caused by the negligence of the United States. Hence, an alternative reason exists for denying summary judgment as to cause of action filed by the Gess Plaintiffs.

### 2. *Roberts Plaintiffs*

 Spec. 4—Ret. Patrick Roberts, Emily's father, admits that he learned of possible malfeasance in the AURH nursery about six or seven months after Emily's birth.[15] Spec. 4 Roberts' Dep. at 12. The Roberts then requested an appointment to talk to the AURH Commander to determine if Emily had sustained any injury. *Id.* at 13–14. The Roberts contend that during an appointment with the AURH Commander in February 1989, they were told that some babies had been injected with a drug and that it appeared that Emily also had been injected. According to the Roberts, the AURH Commander assured them that there would be no residual or long-term effects and that they should not worry about it.[16] The Roberts press this line of factual allegations further by averring that the AURH Commander made it clear to them that Emily was fine and to put it out of their minds. The Roberts claim that this was the extent of their communications with the AURH Commander.[17]

Soon thereafter, the Roberts contend that they were contacted by the OSI. *Id.* at 19–20. The OSI purportedly reassured them that there would be no lasting effects and

that concern was not warranted. Admitting that Emily had been injected with lidocaine, the OSI allegedly expressed to the Roberts that a possible reason why Emily did not go to Baptist Hospital was because she was a larger baby and, thus, capable of combating the drug more easily.[18]

Ms. Roberts claims that she inquired two or three times over the ensuing months as to whether the investigation had yielded any results and that the OSI agent told her "no." According to Ms. Roberts, the OSI staff assured her that they would apprise her of any developments.[19] The Roberts further assert that they were never told that the OSI investigation was over. They also allege that the OSI never advised them as to what to do; therefore, the Roberts followed the advice of the OSI and "put the matter out of their minds."[20] Moreover, the Roberts were never told that they should follow-up on their daughter's diagnosis. Ms. Roberts' Dep. at 13.

The United States produces the following admissions to demonstrate that the Roberts were aware of the cause of Emily's purported injuries in the early months of 1989:

1. Ms. Roberts called the Pediatric Clinic at the AURH and asked to speak with Dr. Carol Green concerning "questions about the nursery" when Emily was six months old.

2. Emily was six months old by January 16, 1989.

3. Ms. Roberts was contacted by agents from the United States Air Force OSI after she spoke to Dr. Carol Green.

4. The Roberts spoke with the Commander of the Maxwell Air Force Base Hospital about a newspaper article entitled "Maxwell Mum about OB Unit Investigation" which was featured in the January 21, 1989 edition of *The Montgomery Advertiser/The Alabama Journal.*

**15.** Spec. 4 Roberts states that his mother, Betty Roberts, informed him after she read the article, "Maxwell Mum About OB Unit Investigation."

**16.** Roberts' Br. in Opp. to Mot. for Summ. J. at 4.

**17.** Spec. 4 Roberts' Dep. at 9–10, 19–21; Roberts' Aff.

**18.** Roberts' Br. in Opp. to Mot. for Summ. J. at 4.

**19.** Spec. 4 Roberts' Dep. at 10–11, 27–28.

**20.** Spec. 4 Roberts' Dep. at 12.

5. The Roberts spoke with the AURH Commander before meeting with two OSI agents.

U.S.' Suppl.Mot. for Summ.J. at 3; Pl.Res. to Def. Request for Adm.

The Roberts assert that they did not learn of the effects of the injection until five years after Emily's birth when Dr. Richard Colan (hereafter "Dr. Colan"), a pediatric neurologist, examined the medical records of the affected children to diagnose and establish a prognosis and to establish causation. *See* Roberts' Res. in Opp. to Mot. for Summ.J. at 6. Therefore, the Roberts contend that the two-year limitations period should have been tolled until that time. Contrarily, the United States claims that the Roberts possessed sufficient knowledge of the cause of Emily's injuries in early 1989 when they were exposed to the article appearing in the *Advertiser/Journal* and had communications with the AURH Commander and OSI investigators. Hence, the United States asserts that the limitations period is not subject to a five-year tolling.

The Roberts further contend that they relied on the advice of the AURH Commander and "put the matter out of their minds." While absolute certainty of one's cause of injury is not a *sine qua non* for the limitations period to commence, the court finds that at the very least, factual issues exist as to whether the Roberts knew that their daughter was injured in 1989. *See Price,* 775 F.2d at 1493. Again as in the Gess case, the court focuses on the representations of the AURH Commander, who also is the ranking physician at the AURH, and stresses that the arguably apparent deception, or at least erroneous information, easily could have lulled the Roberts into believing that there was no causal relation between their son's injuries and the alleged injection(s). The court further finds of great importance the fact that the OSI never informed the Roberts of its findings in reaching its conclusion. Accordingly, factual issues exist as to whether equitable tolling is justified; thus, summary judgment is due to be denied as to the United States' motion for summary judgment as to the Roberts' action.

### 3. Fowler Plaintiffs

The United States asserts that within the meaning of *Kubrick,* the Fowlers knew the cause of their injuries in February 1989, after their conversations with colonels at Wiesbaden and Maxwell Air Force Base. If not then, the United States contends that the Fowlers definitely had knowledge of their son's injuries no later than June 6, 1989, which is the date of the letter addressed to Major Oaks. Therefore, because the Fowlers did not file their administrative claim until March 30, 1993, the United States argues that their claim is time-barred.

The Fowlers, on the other hand, contend that they did not know the cause of Corey's injuries until May 1993 when their attorney, George Beck, Esq. (hereafter "Beck"), contacted them by letter. The information provided Beck was confirmed, according to the Fowlers, when Dr. Colan, a private physician, examined Corey in March 1994. Dr. Colan found numerous medical complications and diagnosed the cause as lidocaine poisoning. Dr. Colan, testified at his deposition, that the injuries resulting from lidocaine cannot be determined until the child reaches at least four years of age. He further states that lidocaine poisoning would not be apparent to a parent who lacked medical training and sufficient information about the specific toxic agent and that any abnormalities easily could be confused with ordinary childhood illnesses.

Based on Ms. Fowler and Dr. Colan's testimony, the court finds that a factual dispute exists as to whether the United States' representations that Corey was not medically harmed prevented the Fowlers from discerning the cause of Corey's illnesses. The court further finds that the Fowlers trusted and relied on the scant information provided by the AURH, easily could have assumed that Corey's medical complications—which included abdominal pain, diarrhea, speech problems, a short attention span and hyperglycemia—were the result of other causes, particularly since the Fowlers were not given any information as to the drug injected. Moreover, the Fowlers' alleged inability to discover the cause is bolstered by the fact that two physicians who examined Corey in February

1989 and November 1992 were unable to find the "cause" of Corey's stomach problems.

At the risk of being redundant, the court again finds the instant case distinguishable from *Kubrick* in that there was no allegation in *Kubrick*, as here, that an agency of the United States withheld pivotal information.[21] Rather, the facts in the instant case are strikingly similar to those in *Burgess*, supra, in that the United States had crucial information within its sole knowledge and possession and never told the Fowlers anything to lead them to suspect that Corey's illnesses were caused by lidocaine toxicity. Accordingly, the court finds that the United States' motion for summary judgment is due to be denied as to the Fowler's action.

#### 4. Barber Plaintiffs

The United States contends that following the March 1989 meeting with the OSI, the Barbers had sufficient information to conclude that the United States caused Tiffany's injuries. The Barbers assert that no one told them that their child had been injected with lidocaine. Also, Tiffany was not one of the babies who was termed code blue[22] and was, therefore, not admitted to Baptist Hospital. Ms. Barber's Dep. at 9. According to Ms. Barber, the OSI offered no explanation as to the cause of Tiffany's complications. *Id.* She contends that her first knowledge of Tiffany's possible injection with lidocaine came in 1992 when she was contacted to be a witness in the *Redner* case.

Ms. Barber claims that Tiffany received checkups but that she was never told that she was not developing normally. She claims that she never saw the newspaper article "Maxwell Mum About OB Unit Investigation," released about two months before she was interviewed by the OSI, or heard anything on the radio regarding the purported lidocaine injections in the AURH nursery. *Id.* at 25–26.

Again, the court finds that the Barbers probably did not know that Tiffany had sus-

tained injury and adopts the discussion set forth, supra, pertaining to the United States' alleged concealment of medical information. Moreover, even assuming that the Barbers were aware of Tiffany's injury, the court concludes that they did not possess sufficient knowledge to articulate with any certainty that Tiffany's injuries were probably caused by AURH personnel. For example, they were not privy to the results of the OSI investigation, nor did they know about the newspaper article concerning the alleged wrongs occurring in the Maxwell Air Force Base nursery. Because the two-part *Kubrick* test is not satisfied, the court finds that the United States' motion for summary judgment on the Barber Plaintiffs' FTCA claim is due to be denied.

#### 5. Schoen Plaintiff

Here, the court finds that factual issues exist as to when Schoen learned of the cause of her injuries. Namely, factual issues exist as to whether or not Schoen relied on the representations of Air Force physicians in not seeking civilian medical treatment and assuming that she was in good health. Again, if the allegations of Schoen are true, which the court assumes for purposes of ruling on this motion, then the deception on the part of the United States is inexcusable.

The court further finds that the blame for Schoen's failure to discover the specific cause of her injuries may well lie with the United States for an additional reason. Had the AURH responded to Schoen's request for medical records without a two-and-one-half year delay and provided her an accurate report, Schoen may have had reliable information upon which to seek further medical or legal advice. The court has doubts as to whether any physician or attorney could adequately advise Schoen of the merits of her claim since the United States concealed the true facts of which it had knowledge. *See also Kubrick*, 444 U.S. at 125, 100 S.Ct. at

**21.** While not material to ruling on the United States' summary judgment motions, the court is particularly disturbed that the United States readily and promptly requested a general release from all liability but was unwilling to provide the Fowlers any information as to the basis for seeking said release, *see* supra at 9.

**22.** The term "code blue" is hospital jargon used to alert personnel to serious and life-threatening problems in the nursery.

360–61 (noting that the statute should not run where "the facts about causation may be in the control of the putative defendant unavailable to the plaintiff or at least very difficult to obtain"). Accordingly, the court finds that the United States' motion for summary judgment as to Schoen's cause of action is due to be denied.

#### 6. *Warrick Plaintiffs*

■ The United States avers that the Warricks possessed the necessary information regarding Quinton's purported injuries and their cause following Ms. Warrick's meeting with the OSI in January 1989. Also, the United States points to the following excerpt from Ms. Warrick's deposition to buttress its claim that the Warrick's claim is time-barred:

Q. Did you think that there might be some association with the fact that he [Quinton] had to go to Baptist Hospital or the fact that he had—could have been injected?

A. A possibility, yes sir.

Q. Did they tell you how that could have happened?

A. No, sir.

Q. Tell me what you remember about what they said about the possibility that he had been injected.

A. They had months from June to November [1988] and said that thirteen babies had been transferred, and they were investigating because it was unusual. And there was a possibility that he could have been injected with something and that he would have been the third child from the—from June to November.

Ms. Warrick Dep. at 26–27. In addition, Ms. Warrick and her mother discussed seeking legal counsel after reading the *Montgomery Advertiser* article, which, according to the United States, is further evidence of the Warricks' knowledge concerning Quinton's alleged injuries and the probable cause thereof.

On the other hand, the Warricks submit a different excerpt from Ms. Warrick's deposition to demonstrate that they lacked the requisite knowledge until four or five years later when Dr. Colan informed them that the incidents involving their child at the AURH

had caused serious long-term effects. On direct examination concerning the meeting with the OSI, the following exchange transpired:

Q. What did they tell you?

A. They said there was a possibility he could have been injected with some type of something.

Q. And did you ask them how or who did it or anything like this?

A. Yes, they didn't give me any information though.

Q. Did you talk to them after that occasion?

A. No sir.

Q. Did you talk to the Commander of the hospital on that occasion?

A. No, sir.

Q. Did you ever talk to anyone from OSI or Maxwell again after that date?

A. No, sir.

Q. Did they tell you anything about who may have given your child something?

A. No sir.

Q. Did they tell you what effect that might have on your child?

A. No sir.

Q. Did they ever give you—report back to you the status of their investigation?

A. No sir.

Q. Did anyone at either Maxwell or the Air Force OSI ever tell you that Quinton had for certain been injected with anything?

A. No sir.

Ms. Warrick's Dep. at 12–13.

The Warricks also aver that other than the one conversation with the OSI investigator, they received no information regarding Quinton's injuries or the precipitating cause. *See id.* at 39–40. Moreover, despite quarterly check-ups for a year at Baptist Hospital in Montgomery, the Warricks claim that they were never given a reason to believe that Quinton was injured and that the attending physician, Dr. Kukarni, never said that anything was wrong with Quinton. *Id.* at 16. Quinton now has a learning deficiency, and, according to the Warrick Plaintiffs, before the revelations of Dr. Colan, they had no reason to connect the incidents at the AURH with the disability.

Based on Ms. Warrick's testimony, the court finds that in viewing the evidence in the light most favorable to the Plaintiffs, the Warricks' claim did not accrue in January 1989—the date alleged by the United States. All the critical information concerning Quinton's physical condition was in the possession and under the control of the United States. Although Quinton received periodic check-ups, his parents were never made aware of any complications. Moreover, the United States adduces no evidence which even suggests that these Plaintiffs had any communications with United States officials following the initial, and apparent perfunctory, meeting with the OSI. Accordingly, the court finds that the United States' motion for summary judgment on the Warricks' claim is due to be denied.

### 7. *Sharpe Plaintiffs*

The United States contends that the statute of limitations began to run, at the latest, in January 1989 when Ms. Sharpe was informed of the OSI investigation. Hence, the United States declares that the Sharpes' administrative claim, filed on February 3, 1994, is time barred by the two-year statute of limitations. The Sharpes, on the other hand, assert that the OSI expressly represented that Asia was not one of the babies injected with lidocaine. Hence, the Sharpes argue that they did not become aware of the cause of Asia injuries under Dr. Colan examined Asia in March 1994.

For the same reasons previously discussed, which the court adopts here, the court finds that the United States' statement that Asia was not injected with lidocaine precludes the granting of summary judgment for the United States. If the United States did not suspect any "foul play" as to Asia, how can the court charge the Sharpes with knowledge of the cause of Asia's injury as early as 1989?

*See generally Overstreet v. United States,* 528 F.Supp. 838 (M.D.Ala.1981) (Hobbs, J.). The Sharpes apparently relied on the communications of the OSI and had no reason not to believe those communications. Hence, it appears to the court that the Sharpes may not have known the cause of any alleged injuries to Asia or the precipitating cause prior to Dr. Colan's statement. At the very least, a factual issue exists as to when the Sharpes knew or reasonably should have known of the cause of Asia's injuries. Accordingly, the United States' motion for summary judgment on the Sharpes' claim is due to be denied.

### B. The Givens' Settlement and Release

The sole issue in this action is whether the amount received in the administrative settlement of the Givens' medical malpractice claim for injuries sustained by their minor daughter prohibits the minor from now seeking relief in federal court. The Givens contend that the settlement agreement and attending release is void, because the United States procured their signature through fraud by failing to reveal that they could recover more than $25,000.00 from the United States. The United States asserts, on the other hand, that nowhere in the settlement document does it mention that $25,000.00 is the maximum the Givens could recover. Herein, together with Lt. Col. Hotchkiss's letter dated May 1990, supra, lies the core of the fraud, a discussion of which follows.

The validity of administrative settlements under the FTCA is governed by 28 U.S.C. § 2672. Pursuant to this statute, a claimant's acceptance of an authorized award, compensation or settlement releases the United States from any and all future liability arising from the acts prompting the award, compensation or settlement "except when procured by means of fraud."[23] 28 U.S.C. § 2672.

**23.** Section 2672 further provides in pertinent part:

The head of each Federal agency or his designee ... may consider, ascertain, adjust, determine, compromise, and settle any claim for money damages against the United States for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his office or

employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred: *Provided,* That any award, compromise, or settlement in excess of $25,000 shall be effected only with the prior written approval of the Attorney General or his or her designee....

Subject to the provisions of this title relating to civil action on tort claims against the United

When analyzing a federal statutory cause of action, a threshold issue is the choice of law by which the claim should be decided, namely, whether state substantive or federal law controls. There are three possible sources of law that possibly could apply in this action: (1) federal common law; (2) Alabama law, the situs of the injury; and (3) California law, the place where the settlement and release was executed. Both the Givens and the United States assert that federal common law, not state substantive law, governs the enforcement and validity of a release entered into under the FTCA. After careful and exhaustive study of the applicable case law, the court cannot as easily reach the same conclusion.

There appears to be no controlling law in this circuit and decisions emanating from other circuits are divided.[24] The majority of the circuits look to state law in determining the validity of a release under the FTCA.[25]

See *Air Transport Assoc., Inc. v. United States,* 221 F.2d 467, 471 (9th Cir.1955); *Matland,* 285 F.2d at 754; *Robinson v. United States,* 408 F.Supp. 132, 136 (N.D.Ill. 1976); *Cordaro v. Lusardi,* 354 F.Supp. 1147 (S.D.N.Y.1973); *Montellier v. United States,* 315 F.2d 180, 185 (2d Cir.1963); *Branch v. United States,* 979 F.2d 948 (2d Cir.1992); *Collins v. United States,* 708 F.2d 499, 500 (10th 1983); *Munson v. United States,* 380 F.2d 976 (6th Cir.1967); *Dixon v. United States,* 197 F.Supp. 798 (W.D.S.C.1961). A few courts, however, have held that federal common law governs the validity of a release. *Huber v. United States,* 244 F.Supp. 537 (N.D.Cal.1965); *Wexler v. Newman,* 311 F.Supp. 906, 907 (E.D.Pa.1970).

▮▮▮ The court, however, need not wrestle with the appropriate choice of law, because the fundamentals of release law, which require the application of general principles of contracts[26], are the same under federal

---

**24.** As authority for their position, Plaintiffs cite *Parker v. DeKalb Chrysler Plymouth,* 673 F.2d 1178 (11th Cir.1982). *Parker,* an action litigated under the Truth in Lending Act, sets forth the general law that "... the issues relating to the validity of and defenses to purported releases of federal statutory causes of action are matters of federal law." *Id.* at 1180. The court then cites three cases holding the same under the Federal Employers' Liabilities Act, federal securities law and the Age Discrimination in Employment Act.

The court has reservations about whether *Parker* is determinative in this case, because unlike the latter statutes, considerable controversy exists as to whether the FTCA creates a new federal right and, thus, renders common law inapplicable. *See Matland v. United States,* 285 F.2d 752, 753 (3d Cir.1961). Moreover and contrary to the aforementioned statutes, the language of the FTCA specifically provides for the application of state law to determine the liability of the United States. *Id.* at 754.

The footnote text (footnote covering 28 U.S.C. § 2672):

States, any such award, compromise, settlement, or determination shall be final and conclusive on all officers of the Government, except when procured by means of fraud.

．．．．．

The acceptance by the claimant of any such award, compromise, or settlement shall be final and conclusive on the claimant, and shall constitute a complete release of any claim against the United States and against the employee of the government whose act or omission gave rise to the claim, by reason of the same subject matter.

28 U.S.C. § 2672.

**25.** These circuits rely on congressional intent and the language of 28 U.S.C. § 1346(b). Section 1346(b) grants the district courts jurisdiction over civil actions for injuries caused by the wrongful act of a United States employee "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." The courts reason that

[i]f the "circumstances" referred to in the statute include, as they do, those creating liability, it follows that they also include those that will release a liability once arisen. To afford Plaintiff the opportunity to prove a liability under state law yet refuse him the opportunity to challenge a release allegedly covering that same liability under the same state law would give rise to an inconsistency not countenanced by the "local law" policy of the Tort Claims Act.

*Robinson v. United States,* 408 F.Supp. 132, 136 (N.D.Ill.1976) (internal footnotes omitted).

The court adds that the law is further complicated in that if state law is followed, the courts are divided about whether the effect of a release executed in a state other than where the claim arose is judged by the law of that state or by the law of the state where the claim arose. *See Matland v. United States,* 285 F.2d 752, 754 (3d Cir.1961).

**26.** A release is a species of a contract and is controlled by contract law. *See Lee v. Hunt,* 631 F.2d 1171, 1173 (5th Cir.1980) (holding that interpretations and validity of settlement agreements is governed by principles applicable to contracts generally).

and state authorities. In other words, a selection of either Alabama, California or federal common law will yield the same result, as all jurisdictions recognize fraud as grounds for setting aside a release. *See Dice v. Akron C. & Y.R. Co.,* 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952) (applying federal common law); *Wright v. United States,* 427 F.Supp. 726 (D.Del.1977) (applying federal law to determine the validity of a release in an action under the FTCA and finding that a release operates as a bar to liability unless there is a showing of "fraud, bad faith, or a willful effort to mislead or deceive"); *Huber v. United States,* 244 F.Supp. 537 (N.D.Cal. 1965) (same);[27] *see also Taylor v. Dorough,* 547 So.2d 536, 540 (Ala.1989) (holding that "[a] release obtained by fraud is void"); *Williams v. Wraxall,* 33 Cal.App.4th 120, 132, 39 Cal.Rptr.2d 658 (1995).

■ A plaintiff may succeed on an action for fraud by showing a suppression of a material fact by one who is under a duty to disclose it. *Williams,* 33 Cal.App.4th at 132, 39 Cal.Rptr.2d 658 (Under California's civil code defining deceit, intentional concealment of material fact is actionable fraud if there is a fiduciary relationship giving rise to a duty to disclose it.); *Boswell v. Liberty Nat. Life Ins. Co.,* 643 So.2d 580 (Ala.1994).[28]

■ A duty to disclose may arise from the confidential relations of the parties or the particular circumstances of the case. *Id.* Circumstances that compel disclosure occur when the party accused of fraud has superior knowledge or expertise not shared by the victim or where one suppresses a fact in order to induce another party to take action

that he or she would not have taken if had that knowledge. *Baker v. Bennett,* 603 So.2d 928 (Ala.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1260, 122 L.Ed.2d 658 (1993); *Williams,* 33 Cal.App.4th at 120, 39 Cal. Rptr.2d 658.

■ The Givens point to the letter written by Lt. Col. Hotchkiss, which specifically informed them that the United States' ". . . offer represents the maximum amount which the Air Force is authorized to approve under the provisions of the Federal Tort Claims Act." The fraud lies in the concealment, says the Givens, because a settlement in excess of $25,000.00 could have been effected with the prior approval of the Attorney General. In support of their position, the Givens submit the following deposition testimony of Sgt. Givens:

Q. What did you understand from that letter?

A. In reading this letter, sir, I understand that the Air Force said to us, well, this is all we can do for you. We understand what you have gone through, but we have no other—our hands are tied as far as any other monetary value or anything that we can tell you about this case.

Q. They say in here, and I quote: Our offer represents the maximum amount which the Air Force is authorized to approve under the provisions of the Federal Tort Claims Act, period, end quote. Did you read that?

A. Yes, sir, we did.

Q. Based upon that representation, did you feel that the maximum amount that

**27.** In *Huber,* an action which arose from a motor vehicle collision involving a federal employee, the plaintiff brought suit under the FTCA and sought recovery for property damage and personal injuries. The United States argued that the administrative settlement, entered into between the plaintiff and it pursuant to 28 U.S.C. § 2672, released it from liability and, thus, barred the lawsuit.

The court granted summary judgment in favor of the United States. Applying federal common law, the court found that absent "an allegation in the complaint, or in any affidavit, of any act, statement, misrepresentation, bad faith, or overreaching on the part of the United States which might invalidate the release," the plaintiff had failed to raise a disputed issue as to the validity of the release. 244 F.Supp. at 538.

**28.** Section 6–5–102 of the Alabama Code provides that "[s]uppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from particular circumstances of the case." Ala.Code § 6–5–102 (1975).

To succeed on a fraudulent suppression claim, the plaintiff must show: "(1) that the defendant suppressed a material fact, (2) that the defendant had a duty to communicate that material fact, either because of a confidential relationship between the parties, or because of the particular circumstances of the case, and 3) that the plaintiff suffered actual injury as a result of the suppression." *Boswell,* 643 So.2d at 581.

the government could give you for this federal tort claim was $25,000.00?

A. Yes, sir, I did.

Q. But for this representation that the maximum amount that the Air Force could pay you was $25,000.00, would you have signed that release?

. . . . .

A. No, sir, I wouldn't have.

Q. Do you feel that $25,000.00 was adequate compensation to compensate your daughter for the injuries and wrongs to you and your wife for what y'all have been put through?

A. No, sir I don't.

Sgt. Givens' Dep. at 28–30.

Based upon a careful reading of Lt. Col. Hotchkiss' letter and Sgt. Givens' testimony, the court agrees that the representations made by Lt. Col. Hotchkiss, on behalf of the United States, at least impliedly raise an inference of deceit. The court finds that a lay person, not learned in the law, easily could interpret the letter as representing the most that the United States could offer. When faced with such an all-or-nothing proposition, any reasonable person naturally would readily accept the $25,000.00. In fact, the court finds that Lt. Col. Hotchkiss' representation that $25,000.00 is the "maximum amount which the Air Force is authorized to approve" arguably is an outright fabrication in light of the plain wording of 28 U.S.C. § 2672, which provides that a settlement exceeding $25,000.00 may be effected "with the prior written approval of the Attorney General or his [or her] designee." *See* 28 U.S.C. § 2672.

Moreover, the court finds that Lt. Col. Hotchkiss, a high-ranking commissioned officer and judge advocate, owed a special duty to Sgt. Givens, an enlisted man, to divulge the whole truth and not reveal only a part of the applicable law of recovery. Given the superior knowledge and grade of Lt. Col.

Hotchkiss and the facts as revealed, the court finds that genuine issues of material fact exist as to whether the court should declare the so-called "settlement" and "release" void ab initio. Hence, summary judgment is due to be denied as to the Givens' cause of action.[29]

 While not raised by the Givens, an alternative reason exists for finding the release void ab initio. The court emphasizes the gravity and severity of the apparent absence of a guardian ad litem and an inquisitorial, if not adversarial, proceeding to determine the adequacy of the settlement agreement, thus, protecting the interests of the minor.[30] *Abernathy v. Colbert County Hosp. Bd.*, 388 So.2d 1207 (Ala.1980); *Torres v. Friedman*, 169 Cal.App.3d 880, 215 Cal.Rptr. 604 (1985) (recognizing the necessity and fiduciary powers of a guardian ad litem). In *Abernathy*, the Supreme Court of Alabama set aside a settlement agreement where the minor's attorney and even the trial court had approved a settlement agreement. The Court held that a pro-ami settlement agreement requires a hearing to determine whether it is in the best interest of the child, and "such a hearing requires an extensive examination of the facts." 388 So.2d at 1214.

*Abernathy* also quoted with approval 42 Am.Jur.2d § Infants 47 (1978):

According to a number of cases, a judgment entered on a compromise of an infant's claim is erroneous, and may be set aside where the court has made no examination or investigation of the facts to determine whether the compromise is for the best interest of the infant. Thus, it is a general rule that where a judgment is rendered for an infant in his action to recover damages for personal injuries, and there is no judicial investigation as to the merits of the claim, but the proceedings are merely formal for the purpose of car-

---

**29.** The court also notes that there is a line of cases concerning unconscionability by which general releases are judged. *See Layne v. Garner*, 612 So.2d 404, 408 (Ala.1992). The court would be hard put to find a stronger example of unequal bargaining power than that between a lieutenant colonel, who wears the coveted badge of an Air Force judge advocate, and an enlisted man who trusts his every word.

**30.** It goes without saying that the chose in action as well as the proceeds belong to the minor, not the parents or the representative in any capacity except in trust for the use and benefit of the minor.

rying out a settlement or compromise action made without the consent of the court, even though the court acquiesces in the rendition of the judgment, relief may be had against the judgment.

*Id.*

Moreover, in *Dixon*, an action arising under the FTCA, a mother filed an administrative claim on behalf of her child, who sustained injuries in a automobile collision involving a federal vehicle. The mother signed the claim in her individual capacity, not "in the capacity of guardian, guardian ad litem, parent, next friend or agent or other legal representative of the infant." *Id.* at 799. In applying the law of South Carolina, the court found the release invalid and, thus, the minor's rights were not restricted by the FTCA. The court found that the appointment of a guardian ad litem was and is a prerequisite for settlement of the minor's claim and that an unauthorized individual does not have the power to waive the right of a minor.[31]

The court emphasizes that the mere fact that the Givens signed the "settlement agreement" as "guardians and next friends" of their child does not breathe into the document any legal credence. Importantly, there is no evidence indicating that a court appointed the Givens as guardian ad litem of their child or that a court reviewed the terms and conditions of the so-called "settlement" and "release." In the case of a minor, the court finds that an adult may never enter into a settlement on behalf of a minor without the

appointment of a guardian ad litem and a court proceeding.[32] This inalienable right to a guardian ad litem again raises factual issues as to whether a valid release was had between the United States and the Givens child.

## II. Plaintiffs' Motion for Summary Judgment

Plaintiffs contend that under the circumstances of this case, Alabama law strongly supports an inference of negligence. Plaintiffs point to the following to support their assertion:

1. Both Plaintiff and United States' experts agree that the most likely cause of the injuries was molestation while receiving care in the Maxwell nursery;

2. Drs. Colan, Walsh and Stigelman believe that the Plaintiffs were injected with a drug such as lidocaine (See Colan's Dep.; OSI Report and Opinions of United States Consultants Drs. Walsh and Stigelman);

3. Col. Robert Jones' conclusion that the babies were probably tampered with while in the AURH (Jones' Dep. at 63–65).[33]

However, Dr. Jones did not think that lidocaine induced the injuries sustained by the various plaintiffs.[34]

To recover under Alabama's negligence law, the following elements must be proven by a preponderance: 1) existence of a duty; 2) a breach of duty; 3) proximate cause; and 4) injury arising therefrom. *Keel v. Banach*, 624 So.2d 1022, 1026 (Ala.1993);

---

**31.** Likewise, in criminal cases, a minor defendant has a right to have a guardian ad litem represent him or her in the prosecution of an action, and the right cannot be waived. *Ridgeway v. Strickling*, 442 So.2d 106, 109 (Ala.Civ.App.1983) (stating that "[w]ith regard to a minor defendant, a guardian ad litem must be appointed").

 Moreover, according to Rule 17(c) of the *Federal Rules of Civil Procedure*, an infant's representative, such as a general guardian, may "sue or defend on behalf of the minor." The Rule also provides that *"[t]he court shall appoint a guardian ad litem for an infant ... not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant...."* The court construes this latter phrase as permitting the establishment of a guardianship, conservatorship or other irrevocable trust should there be recovery on behalf of a minor. In relevant portion, Alabama and California's

Rule 17 mirrors its federal counterpart. Finally, a guardian ad litem may be appointed at any time to ensure that the rights of a minor are properly vindicated and adequately considered. Ala.Code. § 26–2A–52 (1975).

**32.** The court makes perfectly clear that this is not to say that an adult cannot enter into a settlement agreement with the United States if he or she waives counsel, waiver being the voluntary relinquishment of a known right.

**33.** Dr. Jones was the air surgeon for the National Guard Bureau and Commander of the AURH when the alleged malfeasance occurred.

**34.** Despite the varying conclusions regarding the actual cause, Plaintiffs state that the allegedly injured persons were under the control and supervision of the Air Force personnel.

**1450**

Rutley v. Country Skillet Poultry Co., 549 So.2d 82, 85 (Ala.1989); Jones v. Newton, 454 So.2d 1345, 1348 (Ala.1984); Mascot Coal Co. v. Garrett, 156 Ala. 290, 47 So. 149 (1908). Based on the foregoing standard, if the alleged negligent conduct is not the proximate cause of injury, liability becomes a non sequitur. Therefore, the court finds that the aforementioned standard must be satisfied before liability attaches.

 Plaintiffs assert that because agents of the United States have admitted that the Plaintiffs were injured while under their exclusive control, they are entitled to judgment as a matter of law. Furthermore, Plaintiffs allege that because the injuries complained of normally do not occur in the absence of negligence, it is strongly presumed that the United States was negligent. Ward v. Forrester Day Care, Inc., 547 So.2d 410 (Ala. 1989).

Even assuming, arguendo, that the United States' agent(s) behaved negligently, the court points out that such acts may not necessarily be the proximate cause of the injuries allegedly sustained by Plaintiffs. Such acts merely demonstrate that the United States breached its duty, which amounts only to a satisfaction of the second prong of the negligence test. Plaintiffs are still required to demonstrate proximate cause and injury. Negligence in the air is not actionable. At this juncture, the court is not inclined to disclaim the possibility of other causes for Plaintiffs' purported injuries. Therefore, Plaintiffs' motion for summary judgment is due to be denied.

### ORDER

For the foregoing reasons, it is CONSIDERED and ORDERED that the United States' motions for summary judgment be and the same are hereby DENIED. It is further CONSIDERED and ORDERED that Plaintiffs' motion for summary judgment be and the same is hereby DENIED.

DONE.